85 Mass. App. Ct. 301 (2014)                                    301

Beacon South Station Associates, LSE v. Board of Assessors of Boston.

BEACON SOUTH STATION ASSOCIATES, LSE[1] vs. BOARD OF
ASSESSORS OF BOSTON.

No. 13-P-739.

Suffolk. February 12, 2014. - May 14, 2014.

Present: KAFKER, MILKEY, & SULLIVAN, JJ.

*Taxation,* Abatement, Exemption, Leased property, Real estate tax: abatement,
exemption. *Massachusetts Bay Transportation Authority. Boston. Contract,*
Lease of real estate. *Real Property,* Lease.

The Appellate Tax Board (board) correctly granted abatements to the plaintiff
private, for-profit entity, ruling that G. L. c. 161A, § 24 (exemption),
expressly exempted the South Station Headhouse, real property in Boston
owned by the Massachusetts Bay Transportation Authority and leased to
the plaintiff, from taxation in fiscal years 2009 and 2010, in that the statu-
tory exemption applied by its plain terms to all of the property at issue
without regard to whether or for what purpose the property was leased and
notwithstanding any general or special law to the contrary [305-308];
further, there was no merit to the argument of the defendant city board of
assessors that the improvements of the plaintiff's tenants, which were
privately owned according to the terms of the lease, were subject to taxa-
tion, given that the rest of the property (i.e., the land and the building
itself) was plainly exempt [308-310].

APPEAL from a decision of the Appellate Tax Board.

*Anthony M. Ambriano* for the defendant.

*Stephen H. Oleskey* for the plaintiff.

KAFKER, J. The principal issue in this case is whether certain
real estate in Boston owned by the Massachusetts Bay Trans-
portation Authority (MBTA) and leased to a private, for-profit
entity was exempt from taxation pursuant to G. L. c. 161A,
§ 24, in fiscal years 2009 and 2010.[2] The property in question
is the South Station Headhouse (Headhouse), which the MBTA

---

[1]Also known as EOP-South Station, LLC.

[2]As discussed *infra,* our decision applies to the version of the statute in ef-
fect for the tax years at issue.

leases to Beacon South Station Associates, LSE (Beacon), also known as EOP-South Station, LLC (EOP).[3] The Headhouse consists of an enclosed concourse through which the public passes to access MBTA and Amtrak train platforms, an underground subway connection, office and retail space, a surface facility and parking area, and the surrounding sidewalks. The real estate taxes assessed on the Headhouse were $1,439,974.76 in 2009, and $1,135,463.55 in 2010. EOP filed challenges to the 2009 and 2010 fiscal year assessments on the property with the board of assessors of Boston (assessors), and then appealed to the Appellate Tax Board (board) following the assessors' refusal to abate the taxes. The board ruled that G. L. c. 161A, § 24, "expressly exempted the property of the MBTA from taxation, whether or not leased for business purposes," and granted the abatements. The assessors appealed.

On appeal, the assessors' primary argument is that the board erred in its conclusion, and the § 24 exemption did not apply to the Headhouse at all because EOP, a private entity, leased the Headhouse from the MBTA and operated it for profit in the tax years in question. Alternatively, the assessors argue that even if the Headhouse was not subject to a blanket assessment for the years in question, EOP could be taxed on the tenant improvements made to the property because EOP owned these improvements according to the terms of the lease, and they were therefore not property of the MBTA. Examination of G. L. c. 161, § 24, as in effect in 2009 and 2010, its legislative purpose, and the case law interpreting the statute compel us to conclude that no part of the property was subject to taxation in 2009 or 2010, and we therefore affirm the decision of the board abating the taxes for those years.

*Background.* The stipulated factual record is replete with evidence detailing the financial hardships of both South Station and the MBTA. We begin with a brief summary of the history of South Station and how the plans to revitalize it were intended to benefit the ailing MBTA.

---

[3]Beacon was the initial lessee of the property but assigned its interest to EOP in 1998. Although Beacon was the original petitioner involved in the challenge to the taxes assessed in 2009, the petition was later amended to name EOP as the petitioner for both 2009 and 2010. We will refer primarily to EOP as the interested party for the sake of clarity.

Following the increase in air and highway travel after World War II, and through the 1970s, the use of South Station steadily declined and the property deteriorated as a result.[4] Although the Boston Redevelopment Authority (BRA), after purchasing South Station in 1965, originally concluded that it was "infeasible of economic conversion for a better use," the BRA, along with Federal, State, and local agencies, eventually reconsidered and determined that South Station could become a transportation hub and multiuse complex. South Station was reimagined as a "public meeting place" that would include office and retail space and a "grand and spacious" concourse for intra- and intercity travelers and commuters.

As a result, the BRA conveyed South Station to the MBTA in 1979. The MBTA began a $195 million renovation and restoration of the Headhouse in 1984. Funding for this restoration was provided by the MBTA, Amtrak, the Urban Mass Transit Authority, the Federal Railroad Administration, private development corporations, and EOP's predecessor, Beacon.

In 1988, to advance the revitalization plans, the MBTA entered into a long-term lease agreement with Beacon, pursuant to which Beacon agreed to expend a substantial amount of money to renovate and operate the property, and in turn, to earn and share revenue by leasing space to subtenants. Beacon provided $22 million to finance the renovation, supervised the rehabilitation of the Headhouse, and provided property management services for the MBTA. The lease "was not intended to be a conventional, profit-making commercial real estate lease, but rather a lease to provide a public service as well as to offset the cost of redeveloping and operating the facility." The initial term of the lease expires on December 31, 2024. The lease also contains an option for two fifteen-year extensions. Although the MBTA retains ownership of the land and the Headhouse, the lease specifies that Beacon — now EOP — retains title to any and all tenant improvements, but any such improvements not removed at the end of the lease term become property of the MBTA. "Tenant's Improvements" are defined in the lease as follows:

---

[4]In 1970, South Station had one working elevator, and one open staircase. One floor of the station was abandoned, and another floor was closed after a fire.

> "Any and all appurtenances, furnishings, fixtures, equipment, improvements, additions and other property attached to or installed in the Premises by or on behalf of Tenant, including, without limitation, Tenant's Work, any and all Tenant Alterations[5] and any and all appurtenances, furnishing, trade or other fixtures, equipment, improvements, additions and other property installed by or for the use or benefit of any and all Subtenants."

The renovation of the Headhouse, completed in 1989, included interior improvements, with retail and food kiosks on the first floor and office space on the upper floors.

Under the lease, EOP's rental payments to the MBTA are either the greater of (i) a minimum guaranteed rent of $330,000 per year, or (ii) fifty percent of the difference between net available income (as defined in the lease) and the annual capital improvement contribution. The lease also provides that real estate taxes are deducted from the net available income in calculating the annual rent due.

Since 1990, real estate taxes have been assessed on the entirety of the Headhouse. In addition to the various for-profit sublessees that occupy the private retail and office space, both Amtrak and the Commonwealth also sublet office space during the tax years at issue. As explained above, the total real estate taxes for 2009 and 2010 were $1,439,974.76 and $1,135,463.55, respectively. The parties stipulated below that the rental payments to the MBTA would have been greater if the property had not been subject to real estate taxes. For example, in 2009, EOP would have paid $791,936.71, instead of the $330,000 minimum.[6] In issuing its decision on the 2009 and 2010 abatements, the board emphasized that EOP paid significantly less rent to the MBTA than it would have if taxes had not been assessed.

Although the South Station revitalization was successful, the MBTA continues to face grave financial difficulties, including substantial debt. As of early 2011, this debt totaled $5.5 billion.

---

[5]"Tenant's Work" and "Tenant's Alterations" are defined elsewhere in the lease under similarly broad provisions.

[6]The 2010 rental payment had not been made as of the date of the board hearing, and therefore neither the actual payment nor any hypothetical payment adjusted for abatement are in the record.

*Discussion.* 1. *Standard of review.* "At the outset it should be noted that an exemption from taxation is a matter of legislative grace and may be recognized only when the taxpayer shows that he comes within either the express words or the necessary implication of some statute conferring this privilege upon him." *Assessors of Newton* v. *Pickwick Ltd.,* 351 Mass. 621, 623 (1967) (*Pickwick*). See *Boston Chamber of Commerce* v. *Assessors of Boston,* 315 Mass. 712, 716 (1944); *Willowdale LLC* v. *Assessors of Topsfield,* 78 Mass. App. Ct. 767, 769 (2011).

2. *Statutory scheme and MBTA exemption.* In 2009 and 2010, the MBTA exemption statute, G. L. c. 161A, § 24, inserted by St. 1999, c. 127, § 151, provided:

> "Notwithstanding any general or special law to the contrary, the [MBTA] and all its real and personal property shall be exempt from taxation and from betterments and special assessments; and the [MBTA] shall not be required to pay any tax, excise or assessment to or for the commonwealth or any of its political subdivisions . . . ."[7]

As the board recognized, by its plain terms the statutory exemption applied to all of the property at issue without regard to whether or for what purpose the property was leased. See *White* v. *Boston,* 428 Mass. 250, 253 (1998) (courts are constrained to follow statute's plain language). There was no exception carved out of the § 24 exemption for private leases. Moreover, during the years at issue, § 24 expressly provided that the property of the MBTA shall be exempt from taxation "[n]otwithstanding any general or special law to the contrary."

---

[7]In contrast, G. L. c. 59, § 2B, as amended by St. 1980, c. 261, § 13, generally subjects public property to taxation where it is leased to a private party, and it provides in relevant part:

> "[R]eal estate owned in fee or otherwise or held in trust for the benefit of the United States, the commonwealth, or a county, city or town, or any instrumentality thereof, if used in connection with a business conducted for profit or leased or occupied for other than public purposes, shall for the privilege of such use, lease or occupancy, be valued, classified, assessed and taxed annually as of January first to the user, lessee or occupant in the same manner and to the same extent as if such user, lessee or occupant were the owner thereof in fee, whether or not there is any agreement by such user, lessee or occupant to pay taxes assessed under this section."

The Legislature employs the "notwithstanding" language to trump the effect of other potentially inconsistent statutes. In this instance it trumped the effect of G. L. c. 59, § 2B, the general tax statute.

3. *Prior case law interpreting private leases.* We also have specific guidance from the Supreme Judicial Court on the issue of the taxability of MBTA leases to private parties. In *Pickwick,* 351 Mass. at 623-625, the Supreme Judicial Court addressed this question while construing substantially similar statutory language in the predecessors to the MBTA exemption statute and the general public property taxation statute in effect in 2009 and 2010.[8] The court interpreted the exemption statute to "encompass all the [MBTA's] real and personal property," including any property leased from the MBTA by a private, commercial entity, regardless of the purpose for which that property was used. *Id.* at 624. The court emphasized that the Legislature's purpose in establishing the exemption was to alleviate the ailing transportation authority's "crushing financial burden." *Id.* at 626. Consistent with that purpose, the court adopted an interpretation of the exemption that included lessees. *Ibid.* "If the exemption did not include lessees of the authority, the lessee . . . could reduce its rental payments to the authority by the amount of the tax. . . . Such a construction would completely negate the legislative intent . . ." *Id.* at 624-625. See *Martha's Vineyard Land Bank Commn.* v. *Assessors of W. Tisbury,* 62 Mass. App. Ct. 25, 32 (2004), quoting from *Pickwick,* 351 Mass. at 624-626 ("tax exemption that 'primarily benefit[s]' the public by improving the authority's finances had to be liberally read to extend the exemption to the authority's lessees 'by necessary implication,' so as to prevent dissipation of the authority's revenues by having the lessees reduce their rental payments by

---

[8]We do not detail the entire legislative history of the statutes here, as the board did below. We think it sufficient to note that the language at issue in *Pickwick* was from the exemption statute that preceded the version at issue here, but the language in both statutes was nearly identical. The only difference in the exemption language interpreted in *Pickwick* was the absence of the "[n]otwithstanding any general or special law to the contrary" language which was added when the prior MBTA exemption statute was replaced by G. L. c. 161A, § 24. See St. 1999, 127, § 151.

the amount of any tax, because '[t]he [authority's] public purpose is of controlling significance in construing [the] express exemption from taxation' ").

In an attempt to circumvent *Pickwick*, the assessors claim that the holding in that case was effectively overruled before the tax years at issue here by subsequent amendments to the general tax statute. We are not persuaded by this argument. As the court stated in *Pickwick*, the specific MBTA exemption statute controls over the general tax law. *Pickwick*, 351 Mass. at ' 625-626. See *Cabot* v. *Assessors of Boston*, 335 Mass. 53, 63-65 (1956). See generally *TBI, Inc.* v. *Board of Health of N. Andover*, 431 Mass. 9, 18 (2000), quoting from *Risk Mgmt. Foundation of Harvard Med. Insts., Inc.* v. *Commissioner of Ins.*, 407 Mass 498, 505 (1990) ("It is a basic canon of statutory interpretation that 'general statutory language must yield to that which is more specific' "). Had the Legislature wished to limit the exemption after *Pickwick*, it would have had to have done so more expressly and more directly than the changes in the general tax statute relied on by the assessors. Cf. G. L. c. 59, § 5, Second; St. 1956, c. 465, § 17, as amended through St. 1980, c. 497, §§ 1-3. See also *Commissioner of Rev.* v. *Cargill, Inc.*, 429 Mass. 79, 82 (1999) ("Had the Legislature intended to limit the credit in the manner advocated by the commissioner, it easily could have done so"). Despite the various changes to the general tax statute in the years since *Pickwick*, the MBTA exemption statute had been amended only once, in 1999, prior to the tax years in question. See St. 1999, c. 127, § 151. Rather than undermining *Pickwick*, this amendment added the prefatory clause, "[n]otwithstanding any general or special law to the contrary." This amendment, as previously explained, reinforces the specific MBTA exemption by its plain language, evincing the legislative intent that this particular exemption supersedes any other implicated general tax statute.

Finally, we note that the Legislature, in 2013, expressly amended the MBTA exemption statute as part of a comprehensive transportation funding overhaul, adding language specifically excluding lessees from the scope of the MBTA exemption if the property is "leased, used, or occupied in connection with a

business conducted for profit." St. 2013, c. 46, § 50.[9] This change, explicitly narrowing the exemption, reinforces the conclusion that there was a preexisting exemption from taxation for lessees for prior tax years. See *Brooks* v. *School Comm. of Gloucester*, 5 Mass. App. Ct. 158, 161 (1977) ("an amendment to a statute presumably intends a change" to that statute).

In light of the foregoing, we conclude that the board correctly applied the statutory tax exemption to the leased property in 2009 and 2010.[10]

4. *Tenant improvements.* In the alternative, the assessors argue that because the tenant improvements are privately owned according to the terms of the lease — a fact that distinguishes this case from *Pickwick* — these improvements are subject to real estate taxes as private property. According to the assessors, the statutory exemption cannot cover the tenant improvements because EOP has title to these improvements, and thus they do not constitute real or personal property of the MBTA.[11] As an initial matter, it is not clear from the record that the assessors raised this issue before the board, and the board, therefore, did not squarely address this issue in its decision. Even if properly raised below, the argument is without merit.

Real estate taxes are usually assessed on land and buildings as a unit. Cf. *Franklin* v. *Metcalfe*, 307 Mass. 386, 389 (1940), and cases cited; *Ellis* v. *Assessors of Acushnet*, 358 Mass. 473, 475 (1970) ("The law is well settled that land and buildings erected thereon or affixed thereto are properly taxed as a unit and this rule is not affected by private agreements or by the degree of physical attachment to the land"). As the board found, there is no dispute that the land and buildings comprising South Station are owned by the MBTA. They were conveyed to the

---

[9]Beginning in 2007, the city of Boston made several requests that the Legislature amend the MBTA exemption statute to tax MBTA property leased for business purposes.

[10]The assessors also argue that the MBTA had the ability to "bargain away" its exemption in negotiating the lease, and that the lease contemplates that EOP will pay taxes on the property. This argument is unpersuasive, as a party's understanding of whether property is subject to taxation or an exemption does not control the issue. The outcome is determined by reference to the relevant statutes and case law.

[11]The assessors rely solely on the statutory text and do not cite any cases to support this argument.

MBTA by the BRA in 1979. They are real property of the MBTA and, without any showing to the contrary, exempt from taxation. See G. L. c. 161A, § 24. And, as we concluded above, for fiscal years 2009 and 2010, the Headhouse cannot be taxed simply because it is leased to a private party, as the property is owned by the MBTA and thus subject to the exemption statute and the interpretation of that statute in *Pickwick*, 351 Mass. at 623-624.

The assessors, therefore, ask us to carve out the tenant improvements from otherwise tax-exempt property, and to tax those improvements as real estate. We are not persuaded by this argument, as we discern no authority to impose real estate taxes on tenant improvements where the rest of the property — the land and the building itself — is plainly exempt. Cf. *Franklin* v. *Metcalfe*, 307 Mass. at 389; *Ellis* v. *Assessors of Acushnet*, 358 Mass. at 475. In fact, the assessors' own actions undermine this type of separate treatment, as their assessments of the property have never attempted to carve out the improvements as separate real estate. And, although the board did not address this precise issue, its finding that the property as a whole belonged to the MBTA and was tax-exempt is consistent with how real estate taxation generally operates — by assessing the land and buildings as a unit, and not severing improvements for separate taxation. Here, that unit is exempt from taxation as real property of the MBTA.

Our examination of the exemption's statutory purpose further compels the conclusion that the improvements are not subject to taxation. It is clear that the exemption was broadly intended to alleviate the financial burden on the MBTA. See *Pickwick*, 351 Mass. at 624 & n.4. In this case, the taxes assessed on the Headhouse have substantially reduced the rental payments to the MBTA. And, as the board noted, "the primary concern of the court in *Pickwick* — the specter of decreased revenue to an already ailing transportation agency — remains an issue at present." The lease provisions granting title to the improvements to EOP were intended to provide an incentive to a private party to participate in a partnership that would make the South Station renovation financially feasible for the financially beleaguered MBTA. The benefits of the improvements and the

property as a whole were intended to inure to the MBTA and, by extension, the public.[12] Cf. *Rohr Aircraft Corp.* v. *County of San Diego*, 362 U.S. 628, 634-635 (1960) (despite statute subjecting property of Reconstruction Finance Corporation to taxation, and despite corporation having record title to certain property, property was exempt from taxation because benefits of property inured to United States); *Emhart Corp.* v. *State Tax Commn.*, 363 Mass. 429, 432 (1973) ("mere paper transfer" of property may not alter availability of exemption).

*Conclusion.* For the reasons discussed above, we affirm the board's ruling that the South Station Headhouse, including the tenant improvements, was exempt from taxation in 2009 and 2010.

> *Decision of Appellate Tax Board*
> *affirmed.*

---

[12]Furthermore, EOP's title to the improvements is only temporary. According to the terms of the lease, the improvements will become the MBTA's property at the end of the lease — as early as 2024 — unless they are removed by EOP.