NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-13489

OUTFRONT MEDIA LLC  vs.  BOARD OF ASSESSORS OF BOSTON.


Suffolk.     January 8, 2024. - April 22, 2024.

Present:  Budd, C.J., Gaziano, Kafker, Wendlandt, & Georges, JJ.


Taxation, Real estate tax:  abatement, Real estate tax:
    exemption.  Real Property, Tax.  Massachusetts Bay
    Transportation Authority, Contract.  Advertising.  Sign.
    Practice, Civil, Burden of proof.  Statute, Construction.
    Words, "Used," "In connection with."


Appeal from a decision of the Appellate Tax Board.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.


Kelly L. Frey (Edmund P. Daley also present) for the taxpayer.
Anthony M. Ambriano for board of assessors of Boston.
Thomas R. Kiley & Meredith G. Fierro, for Out of Home Advertising Association of America, amicus curiae, submitted a brief.
Dustin F. Hecker & Daniel B. Winslow, for New England Legal Foundation, amicus curiae, submitted a brief.


KAFKER, J.  The real and personal property of the

Massachusetts Bay Transportation Authority (MBTA) is generally

exempt from tax.  G. L. c. 161A, § 24 (§ 24).  However, any MBTA real estate that is "leased, used, or occupied in connection with a business conducted for profit" is taxed as if the lessee, user, or occupant were the owner in full of the real estate. Id.  At issue here is the use of MBTA outdoor advertising signs. Outfront Media LLC (Outfront) entered into a contract with the MBTA that, among other things, gave Outfront the exclusive right to advertise on outdoor advertising signs owned by the MBTA. Under the contract, Outfront was required to pay a minimum guaranteed amount to the MBTA and a set percentage of any advertising revenue earned above the minimum guaranteed amount. However, Outfront was entitled to the rest of any advertising revenue and was not capped on the amount of revenue it could potentially earn from the signs.

The city of Boston (city) assessed real estate tax for fiscal year 2021 on Outfront for the signs.  Outfront sought an abatement of the tax, arguing that the signs were exempt from taxation under § 24.  The city denied Outfront's claim for abatement, and Outfront appealed to the Appellate Tax Board (board), which upheld the tax assessment.

The main issue in this case is whether Outfront's employment of the signs to post advertisements and generate advertising revenue, among other activities, is a "use" of the MBTA's property "in connection with a business conducted for

profit" under § 24.  We conclude that such a use includes the advertising business conducted for profit by Outfront here, and we distinguish such businesses from those merely providing a service for the MBTA such as a janitorial service.  We thus hold that Outfront used the signs within the meaning of § 24 and uphold the decision of the board.[1]

1.  Background.  a.  Facts.  The following facts are undisputed.[2]  The MBTA owns many outdoor advertising signs (MBTA signs), which are managed by outside contractors and provide a reliable revenue stream to support the MBTA's transit operations.  In April 2019, the MBTA issued a request for responses, seeking bidders for a long-term contract to operate and maintain existing signs, as well as to implement new signs.  Pursuant to the request, in October 2019, Outfront entered into

---

[1] We acknowledge the amicus briefs submitted by the Out of Home Advertising Association of America and the New England Legal Foundation.

[2] On appeal, Outfront argues that there is a material question of fact whether the assessed property taxes negatively affect the MBTA's income.  However, Outfront did not raise this factual dispute before the board.  Rather, Outfront made a legal argument regarding the taxes interfering with the MBTA's essential government function, but it did not dispute any specific facts in the record.  Having failed to raise this argument below, Outfront has waived it.  See Carey v. New England Organ Bank, 446 Mass. 270, 285 (2006).  Moreover, as discussed infra, we conclude that the taxation of the MBTA pursuant to § 24 does not interfere with the MBTA's essential government function.

a contract with the MBTA (contract) to manage the MBTA signs through June 2034.

Specifically, under the contract, the MBTA granted Outfront the exclusive right to advertise on 121 existing signs and seven new signs to be designed and installed by Outfront on MBTA property. Outfront also received "the exclusive right to install, license, operate and maintain telecommunications equipment" on the MBTA signs as an ancillary use.[3]

The contract gave Outfront the power to set rates and charges for the sale of advertising space on the MBTA signs, subject to the prior review and approval of the MBTA.[4] The MBTA also reserved the right to use, at no cost, up to twenty-five percent of the digital display time on the MBTA signs to market the image and services of the MBTA and its municipal partners. Moreover, Outfront was required, again at no cost, to make sign display time available to the MBTA and other government agencies

---

[3] It appears that the telecommunications arrangement was generally similar to the advertising arrangement. Outfront could contract with third parties that wanted to install equipment for purposes of providing telecommunications services (such as wireless Internet), and the MBTA was entitled to a share of any revenue from these contracts. Outfront received the remainder of the revenue, which was not capped.

[4] The MBTA also reserved the right to review the content of the advertising. Outfront could select advertisers, but in doing so was required to evaluate all advertising content to be posted for compliance with the MBTA's advertising guidelines. Prior to posting any advertisements, Outfront submitted the content to the MBTA for its review and approval.

to post emergency messages involving public safety or major service disruptions.

Outfront was also required to compensate the MBTA in several ways. First, regardless of revenue earned, Outfront paid the MBTA a minimum annual guaranteed amount of $3,366,000. Second, Outfront paid the MBTA each month a share of the gross revenue it earned from the MBTA signs. The MBTA's gross revenue share was a set percentage of advertising and telecommunications revenue from the MBTA signs that exceeded the monthly guaranteed amount. Outfront was entitled to the remaining revenue it earned above these amounts and was not capped on the amount of revenue it could earn from the MBTA signs or the telecommunications equipment.

The contract generally required Outfront to bear the costs of installing, maintaining, and operating the MBTA signs. For example, Outfront was required to obtain all government permits at its own cost and expense, bear the risk of any loss from damage to the MBTA signs, and cover the costs of repairs to the MBTA signs. Similarly, the contract required that the MBTA signs be powered and metered in Outfront's name and that Outfront pay all related utility costs and fees. Outfront was also required to carry a range of insurance policies, such as general liability, automobile liability, and workers' compensation. Finally, Outfront was responsible for paying all

taxes applicable to services it performed and the rights and interests granted to it under the contract, but the MBTA agreed "[t]o the extent allowed by law" to pass on to Outfront any tax exemptions applicable to the MBTA.

Upon the contract's expiration or termination, Outfront was required to "hand back" the MBTA signs to the MBTA in a state of good repair and to assign all existing revenue-generating contracts to the MBTA; Outfront was entitled to fifteen percent of all advertising revenue collected after the date of assignment.

The city assessed $198,257.49 in real estate taxes on Outfront for the MBTA signs located in the city for fiscal year 2021. Outfront paid the taxes and applied for an abatement of all such taxes assessed by the city. The city denied the abatement applications, and Outfront timely appealed to the board, which upheld the tax assessment.

b. Procedural history. In January 2022, Outfront moved for summary judgment before the board. The city subsequently moved for partial summary judgment.[5] The board found that Outfront "used" the MBTA signs within the meaning of § 24 and thus was not exempt from property tax and denied Outfront's request for

---

[5] Outfront elected to withdraw its secondary and alternative challenge to the valuation of the MBTA signs that are the subject of this appeal.

an abatement. Outfront appealed, and we transferred the case on our own motion from the Appeals Court.

2. Discussion. a. Standard of review. In our review of board decisions, "[w]e uphold findings of fact of the board that are supported by substantial evidence" and "review conclusions of law, including questions of statutory construction, de novo." Shrine of Our Lady of La Salette Inc. v. Assessors of Attleboro, 476 Mass. 690, 696 (2017) (Our Lady of La Salette). Because this case was submitted to the board on a statement of agreed facts, "the inferences drawn by the board from the facts stated are not binding upon us" (alterations and citation omitted). Middlesex Retirement Sys., LLC v. Assessors of Billerica, 453 Mass. 495, 499 (2009). Although we review questions of law de novo, "because the board is an agency charged with administering the tax law and has expertise in tax matters, we give weight to its interpretation of tax statutes, and will affirm its statutory interpretation if that interpretation is reasonable" (quotation and citations omitted). AA Transp. Co. v. Commissioner of Revenue, 454 Mass. 114, 118 (2009). But "principles of deference are not principles of abdication," and ultimately, "the interpretation of a statute is a matter for the courts" (citations omitted). Our Lady of La Salette, supra.

b. Burden of proof. At the threshold, we must determine who carries the burden of proof. Outfront argues that the city

should carry the burden of proving that Outfront is subject to taxation by establishing that it uses public property in connection with a business conducted for profit. The city maintains that Outfront is seeking a tax exemption and thus the burden of proof properly lies with Outfront. We conclude that Outfront is seeking a tax exemption, and therefore, it must shoulder the burden of proof.

As a general rule, "[a]ll property, real and personal, situated within the commonwealth . . . , unless expressly exempt, shall be subject to taxation." G. L. c. 59, § 2. General Laws c. 161A, § 24, states that "[n]otwithstanding any general or special law to the contrary, the [MBTA] and all its real and personal property shall be exempt from taxation and from betterments and special assessments." However, the exemption does not apply to any MBTA real property if it is "leased, used, or occupied in connection with a business conducted for profit." G. L. c. 161A, § 24. Such property is taxable to the lessee, user, or occupant as if they were the owner in full of the real property. Id.

When construing a tax exemption, we are "guided by the principle that 'an exemption from taxation is a matter of special favor or grace, and . . . statutes granting exemptions from taxation are therefore to be strictly construed.'" Reagan v. Commissioner of Revenue, 491 Mass. 446, 451 (2023), quoting

South Boston Sav. Bank  v. Commissioner of Revenue, 418 Mass. 695, 698 (1994).  See Beacon S. Station Assocs. v. Assessors of Boston, 85 Mass. App. Ct. 301, 305 (2014).  "An exemption is 'to be recognized only where the property falls clearly and unmistakably within the express words of a legislative command.'"  Reagan, supra, quoting State Tax Comm'n v. Blinder, 336 Mass. 698, 703 (1958).  "The burden is on the taxpayer to demonstrate entitlement to an exemption claimed."  Reagan, supra, quoting South Boston Sav. Bank, supra.

Outfront nonetheless argues that because the applicability of the exception to § 24's general rule of tax exemption is at issue, the city is effectively seeking to tax Outfront and, thus, we should apply the canon of construction that "tax laws are to be strictly construed" and "[t]he right to tax must be plainly conferred by the statute"; it cannot be implied (citation omitted).  Squantum Gardens, Inc. v. Assessors of Quincy, 335 Mass. 440, 447-448 (1957).  We disagree.  Although Outfront is correct that tax statutes are strictly construed in favor of the taxpayer, this standard is applied when determining whether a statute imposes a tax, rather than where, as here, the issue is whether the taxpayer is entitled to an exemption.  See AA Transp. Co., 454 Mass. at 121 (finding taxpayer incorrectly applied standard for construing statute imposing tax to claim of exemption).  Contrast Citrix Sys., Inc. v. Commissioner of

Revenue, 484 Mass. 87, 91-92 (2020) (noting that tax statutes are strictly construed with ambiguity resolved in favor of taxpayer where issue was whether sales tax applied to software subscription fees).

The issue here is whether Outfront may benefit from the MBTA's tax exemption. Absent such exemption, there is no question that the real property would be subject to taxation. Indeed, neither party contests the fact that, but for the § 24 exemption, and in the absence of any other applicable exemptions, the signs would generally be taxable as real property. See G. L. c. 59, § 2. Rather, the parties dispute whether a tax exemption applies. Consequently, as this case involves the scope of a tax exemption, and not the power to impose the tax, the burden of proof falls on the party seeking the exemption, Outfront.

The fact that § 24 contains an exception to the tax exemption does not shift the burden to the city. This court has applied the same burden of proof on the taxpayer for exemptions that contain exceptions. In Our Lady of La Salette, 476 Mass. at 695-696, we interpreted a property tax exemption, G. L. c. 59, § 5, Eleventh, which applies to "[h]ouses of religious worship owned by, or held in trust for the use of, any religious organization, and the pews and furniture and each parsonage so owned . . . for the exclusive benefit of the religious

organizations."  This exemption also contains an exception --
the exemption does not "extend to any portion of any such house
of religious worship appropriated for purposes other than
religious worship or instruction."  Id., quoting G. L. c. 59,
§ 5, Eleventh.  Among the issues on appeal was whether certain
uses of the religious organization's property were for purposes
other than religious worship or instruction.  Our Lady of La
Salette, supra at 691.  In interpreting the statute, we applied
the typical canon of construction for tax exemptions and placed
the burden of proof on the taxpayer.  Id. at 696.

Similarly, in New England Legal Found. v. Boston, 423 Mass.
602, 609 (1996), this court interpreted another property tax
exemption containing an exception.  General Laws c. 59, § 5,
Third, exempts real estate owned by or held in trust for a
charitable organization and occupied by the organization or its
officers for the purposes for which it was organized, but it
includes an express exception for any income or profits of the
charitable organization used for other than "literary,
benevolent, charitable, scientific or temperance purposes."  Id.
at 603 n.2, quoting G. L. c. 59, § 5, Third (a).  The city taxed
the New England Legal Foundation's (NELF's) office units, taking
the position that NELF was not a charitable organization or,
even if NELF was a charitable organization, it was not exempt
because the express exception applied.  New England Legal

Found., supra at 612. Here, we also applied the standard rule of construction for tax exemptions, noting that "a heavy burden rests on the taxpayer to demonstrate that the tax exemption . . . applies." Id. at 613.

Outfront, apart from citing the standard rule of strictly construing taxing statutes, offers no support for the proposition that exceptions to exemptions should be construed in favor of the taxpayer. Thus, "[t]he burden is on [Outfront] to demonstrate entitlement to an exemption claimed." Reagan, 491 Mass. at 451, quoting South Boston Sav. Bank, 418 Mass. at 698.

c. Meaning of "used . . . in connection with a business conducted for profit" in § 24. The principle substantive question in this case is whether the property in question was "used" "in connection with a business conducted for profit" under § 24. We conclude that it was. "Used . . . in connection with a business conducted for profit" has a particular meaning here. As did the board, we draw a statutory distinction between using public property to conduct a for-profit business, which would thereby provide the business with an advantage over a competitor operating on private property, and simply providing services to the public entity, such as janitorial or plumbing services. "Used" in this context involves more than just a presence on the property to provide services requested by the public owner. Rather, "used" in § 24 refers to a right to

exercise a significant degree of control over the property to conduct for-profit business on it.

"A statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the main cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated" (alteration and citation omitted). Reuter v. Methuen, 489 Mass. 465, 470 (2022). While G. L. c. 161A contains a definition section addressing many of the terms in the statute, the word "use" is not defined in that section or elsewhere. See G. L. c. 161A, § 1. "When a statute does not define its words we give them their usual and accepted meanings, as long as those meanings are consistent with the statutory purpose. . . . We derive the words' usual and accepted meanings from sources presumably known to the statute's enactors, such as their use in other legal contexts and dictionary definitions." Matter of the Estate of Slavin, 492 Mass. 551, 554 (2023), quoting Williams v. Board of Appeals of Norwell, 490 Mass. 684, 693-694 (2022).

We also do not interpret words in a statute in isolation. See Plymouth Retirement Bd. v. Contributory Retirement Appeal Bd., 483 Mass. 600, 605 (2019) ("Beyond plain language, courts

must look to the statutory scheme as a whole so as to produce an internal consistency within the statute. Even clear statutory language is not read in isolation" [quotations, citations, and alteration omitted]). Further, "[t]he canon of noscitur a sociis counsels that terms must be read within the context of the statute in which they appear. . . . The literal meaning of a general term in an enactment must be limited so as not to include matters that, although within the letter of the enactment, do not fairly come within its spirit and intent" (quotation and citation omitted). Richardson v. UPS Store, Inc., 486 Mass. 126, 130-131 (2020).

i. Plain language and statutory context. We start with the "ordinary and approved usage of the language" of the statute. Oracle USA, Inc. v. Commissioner of Revenue, 487 Mass. 518, 522 (2021), quoting Commissioner of Revenue v. Gillette Co., 454 Mass. 72, 76 (2009). Section 24 states that "[r]eal property of the [MBTA] shall, if leased, used, or occupied in connection with a business conducted for profit . . . be valued, classified, assessed and taxed . . . to the lessee, user, or occupant in the same manner and to the same extent as if such lessee, user, or occupant were the owner thereof in full" (emphases added). G. L. c. 161A, § 24. Read in isolation, "use" is a capacious term. See, e.g., Gordon v. Safety Ins. Co., 417 Mass. 687, 690 (1994), quoting Webster's Third New

International Dictionary 2523 (1961) ("The ordinary meaning of 'use' includes 'the legal enjoyment of property that consists of its employment, occupation, exercise or practice'").  However, looking to the words surrounding "use" in § 24 offers us a narrower understanding of the word.

First, "used" appears in a list, alongside "leased" and "occupied."  Occupancy is "[t]he act, state, or condition of holding, possessing, or residing in or on something."  Black's Law Dictionary 1297 (11th ed. 2019).  A lease is generally understood as a "contract[] for the possession of property" (citation omitted).  Humphrey v. Byron, 447 Mass. 322, 326 (2006).  See Black's Law Dictionary 1068 (11th ed. 2019) (defining lease as "[t]o grant the possession and use of [land, buildings, rooms, movable property, etc.] to another in return for rent or other consideration").  These terms share a common feature -- they imply a significant degree of control over the property, akin to the type of control the property's owner would be able to exercise.  See Reade v. Secretary of the Commonwealth, 472 Mass. 573, 581 (2015), cert. denied, 578 U.S. 946 (2016), quoting Franklin Office Park Realty Corp. v. Commissioner of the Dep't of Envtl. Protection, 466 Mass. 454, 462 (2013) ("words grouped together in a statute must be read in harmony, and we are not free to interpret one provision in a way

that makes it exceptionally broader than its neighbors" [alterations omitted]).[6]

Second, § 24's exception does not apply to all uses of MBTA property, only to the use of MBTA property "in connection with a business conducted for profit."  "'In connection with' . . . is defined as related to, linked to, or associated with."  Nguyen v. Arbella Ins. Group, 91 Mass. App. Ct. 565, 568 (2017), quoting Metropolitan Prop. & Cas. Ins. Co. v. Fitchburg Mut. Ins. Co., 58 Mass. App. Ct. 818, 821 (2003).  Thus, the use must be linked or related to the operation of a business for profit.  This is important because the amendment of § 24 to add the exception has the effect of preventing such businesses from gaining an advantage over competitors operating on property subject to taxation.[7]

---

[6] It is noteworthy that § 24 provides that the for-profit business lessee, user, or occupant of MBTA property is, for tax purposes, treated as the "owner thereof in full."  This reinforces the notion that "use" must be understood to require a significant degree of control over the property, rather than mere presence on the property.  Indeed, it would be odd to treat a plumber or janitor as an owner of MBTA property merely because they service the property.  Such a result can be avoided by focusing on the requirement that the use include exercising a significant degree of control over the property in connection with a business for profit.  See Attorney Gen. v. School Comm. of Essex, 387 Mass. 326, 336 (1982) ("We will not adopt a literal construction of a statute if the consequences of such construction are absurd or unreasonable")

[7] Prior to 2013, § 24 did not include any exception for property used, leased, or occupied in connection with a business for profit, and the exemption was uniformly interpreted to

Taken as a whole, the phrase "used . . . in connection with a business conducted for profit" requires a significant degree of control over the property.  It also requires that the activity being conducted on the property be a business for profit, reflecting a level of control of not only the property but also the revenues being generated by the property.  When the business being conducted on the property not only provides services to the MBTA, but also engages in a business for profit with third-party customers and controls the profits from such business, it is exercising a much greater degree of control over the property and the revenues it may generate than a service provider.

The janitor who cleans an MBTA station or the plumber who replaces a leaky pipe on MBTA property would not use MBTA property in connection with a business conducted for profit as

---

"'encompass all the [MBTA's] real and personal property' including any property leased from the MBTA by a private, commercial entity, regardless of the purpose for which that property was used."  See Beacon S. Station Assocs., 85 Mass. App. Ct. at 306, quoting Assessors of Newton v. Pickwick Ltd., 351 Mass. 621, 624 (1967).  In 2013, the statute was amended to add the exception at issue.  St. 2013, c. 46, § 50.  The addition of the exception to § 24 "explicitly narrow[ed] the exemption."  Beacon S. Station Assocs., supra at 308.  See Marshfield v. Springfield, 337 Mass. 633, 637-638 (1958) ("Presumably some change of meaning was intended" by amendment to statute).  One effect of narrowing § 24's exemption is to place businesses that use MBTA property to conduct a for-profit business in the same competitive position as businesses that operate on private property.

those terms are properly understood under § 24.  Their degree of control over the property is too limited.  To perform the services requested of them, their physical control over the property is confined to the time and space needed to perform the services requested.  Their control over the revenues that may be generated by the property are also more limited.  They are not empowered to serve their own clients and retain the profits from those third-party transactions.  The revenues they receive from the MBTA are also defined by the service contract.  Contrast this with the owners of a for-profit coffee shop or restaurant operating inside an MBTA station.  They enjoy a much greater degree of physical control over the property, including the design and operation of their business.  They also charge for their own third-party customers, and do not just receive revenues from the MBTA.  Finally, they retain the revenues that may be generated from their right to use the property for their for-profit business.  If they are exempt from taxation, they also have an advantage over a similar coffee shop or restaurant operating on private property and subject to taxation.  A service provider is not similarly advantaged.

ii.  Application of § 24 to Outfront.  Applying these principles to the instant case, Outfront is not just providing services to the MBTA, it is using the MBTA's property to conduct a business for profit.  Outfront's control over the property and

the revenues that may be generated by the property reflect this distinction. Its exclusive physical control over the property is significantly greater than a service provider, such as a janitorial or maintenance company. Outfront also conducts a for-profit business in which it charges third-party customers and retains the profits from such transactions, again reflecting its control of not only the physical property but also the revenues that may be generated from the property, thereby exercising a more comprehensive level of control of the property akin to an owner.

More specifically, the agreement gives Outfront the exclusive right to advertise on existing signs and to advertise on new signs designed and installed by Outfront on MBTA property, and to contract with the private parties seeking to advertise on those signs. Outfront also has the exclusive right to install, license, operate, and maintain telecommunications equipment on the MBTA signs, and to contract with those telecommunication companies.

Further, Outfront is not paid a flat fee for the services provided. Rather, Outfront is compensated through revenue that it generates from the MBTA signs and telecommunications equipment installed on the signs, and may reap significant, uncapped profits from such operations. Outfront is not merely present on MBTA property to perform services for the MBTA.

Rather, it is <u>using</u> the MBTA signs to conduct a for-profit business.

    iii.  <u>The board's decision in Ogden Entertainment Servs.</u>
<u>vs. Assessors of Hadley</u>.  Our interpretation here, particularly the distinction we draw between providing services to a public entity and operating a business for profit on the property, is informed by the board's analysis in Ogden Entertainment Servs. vs. Assessors of Hadley, App. Tax Bd. Nos. F238188, F242126, ATB 2000-978 (Dec. 12, 2000) (Ogden decision), as the board interpreted "use" in a similarly worded statutory provision in connection with a for-profit business and drew a similar distinction.  As the board explained in that case:

> "Ogden [Entertainment Services (Ogden)] was engaged by
> . . . the owner of the property[] to perform certain
> managerial and administrative functions which the
> University [of Massachusetts (university)] would otherwise
> need to perform itself.  In this respect, the [b]oard found
> Ogden's relationship to the Mullins Center [at the
> university] to be like that of a janitor, plumber, food
> concessionaire or other independent contractor.  Surely, it
> could not reasonably be argued that a service provider
> . . . should be assessed a real estate tax based on the
> fact that it 'uses' the facility to make a profit."[8]

Ogden decision, ATB 2000 at 987-988.

    Although we adopt the distinction drawn in the Ogden decision, we do not accept Outfront's argument and conclude that

---

[8] We note that there are many different types of food concessionaire arrangements, and we do not find that reference helpful for defining the difference between a service provider and a business operated for profit.

the result here is determined by that decision, as the facts are distinguishable.  Ogden fell on the service provider side of the line, or at least the board could so reasonably conclude.  AA Transp. Co., 454 Mass. at 118 (discussing deference owed to board's reasonable interpretation of tax law).  In particular, as explained infra, the revenue sharing arrangements differed significantly.

More specifically, in the Ogden decision, the board construed G. L. c. 59, § 2B, which states that real estate owned by the Commonwealth, if "used in connection with a business conducted for profit or leased or occupied for other than public purposes," will be taxed as if the "user, lessee or occupant were the owner thereof in fee."  In that case, the university had entered into a management agreement with Ogden for Ogden to provide management services in conjunction with the university's operation of the Mullins Center.  Ogden decision, ATB 2000 at 980.  The university used the Mullins Center for various university activities, including classes, sporting events, convocation ceremonies, theater productions, and concerts.  Id. at 980-981.  The Mullins Center also hosted non-university events such as professional concerts, magic shows, and wrestling matches.  Id.  The services Ogden provided included event scheduling, custodial and cleaning services, ticket sales, insurance, and security.  The management contract thus did

provide some substantial degree of control over the property to Ogden. Id. at 980.

The financial arrangement, however, was significantly different. The university paid Ogden (a) a monthly flat management fee and (b) an "incentive fee" equal to thirty percent of revenues over $190,000 for non-university events held at the Mullins Center. Id. at 982. The incentive fee was capped so that Ogden would never receive more than twenty-five percent of gross revenue in excess of direct operating costs. Id. All profits and losses, including all direct operating costs and taxes, from the operation of the Mullins Center "flow[ed] through [Ogden] to the [u]niversity." Id.

This, we conclude, is a key factual distinction between Outfront's and Ogden's contractual arrangements, and one that permitted the board to conclude that Outfront was using the property to conduct a business for profit, while Ogden was not. While Outfront must share a set percent of revenue with the MBTA, in addition to the guaranteed minimum amount, there is no cap on the amount of revenue Outfront can earn. Further, whereas Ogden passed all profits, losses, costs, and taxes on to the university, Outfront must bear most of the costs related to the MBTA signs, including installation and maintenance, utilities, and taxes. Thus, Outfront incurs both the risks and rewards of its operations as it only makes money to the extent

of any revenue it can generate from advertising or installing telecommunications equipment on MBTA property, and this revenue, while shared with the MBTA, is not capped.  Outfront shares fully in both the upside and the downside of the MBTA signs in a way that Ogden never did with the Mullins Center, and Outfront enjoys a significant level of control over the revenues to be derived from the property that Ogden did not possess.[9]

In sum, we conclude that the board's Ogden decision and the instant case are reconcilable due, at least in part, to the different financial arrangements.

iv.  <u>Technical or common-law meaning</u>.  We next address Outfront's contention that § 24 incorporates a specific, restrictive, common-law meaning for the term "use and occupancy" that requires a greater possessory interest in the property than that granted to Outfront.  For support, Outfront relies only on a few early Twentieth Century cases interpreting the meaning of

---

[9] Another example of a business that could be exercising significant control over a property but still providing services rather than using the property to conduct a for-profit business is a company hired to provide security services.  The security guards would likely have significant control over the property; for example, they might be able to eject or exclude certain people from the property.  But they would be doing so pursuant to a set fee-for-services agreement, not an agreement that allowed them to operate a for-profit business on the property under which they charged third parties and made profits from such charges.  At least a security company's control over the revenues that could be derived from the property would be significantly less than a company operating a for-profit business on the property.

"use and occupancy," apparently in the context of common-law pleading requirements. See, e.g., Gaertner v. Donnelly, 296 Mass. 260, 261 (1936) (explaining that claim for "use and occupation" is essentially claim for rent under demise, which requires proof of a landlord-tenant relationship[10]). See E.G. Daher, H. Chopp, M.W. O'Connor, & R. Sayeg, Landlord and Tenant Law § 17:9 (3d ed. July 2023 update) (under current law, "[i]n order to maintain an action for use and occupation of land, evidence must be produced to establish the relationship of landlord and tenant . . . . Something in the nature of a demise must be shown").

We discern no basis for concluding that the Legislature adopted this specific, restrictive common-law interpretation in § 24. We have been presented with no legislative history to that effect. The cases cited also involve issues very different from the tax exemption in question here.

Most importantly, the text itself is different. Section 24 does not refer to "use and occupation," rather it separates the words "lease, use, or occupy" with the disjunctive "or." Use of the property alone is sufficient so long as it is in connection with a business for profit as described above. Although a

---

[10] A demise is "[t]he conveyance of an estate [usually] for a term of years, a lease." Black's Law Dictionary 544 (11th ed. 2019).

significant level of control over the property is required, a formal lease is not. Even in the older cases cited by Outfront the court recognized that the alleged tenants had a possessory interest; it just distinguished such possessory interests from a lease. See Gaertner, 296 Mass. at 261-262 (defendant had only license to put sign on plaintiff's roof and right to "use" roof to maintain sign, but no landlord-tenant relationship existed); Jones v. Donnelly, 221 Mass. 213, 217-218 (1915) (no use and occupancy established where defendant "had merely a right or privilege to occupy the roof" and where agreement "conveyed no title or interest in the building or in any part of it").

d. Essential government function. Outfront also argues that the city is barred from taxing the MBTA signs because such taxes may reduce the amount of revenue the MBTA will earn from its contract with Outfront. We conclude that the essential government function doctrine does not bar the city from taxing Outfront.

The essential function of the MBTA is to provide mass transportation services. Massachusetts Bay Transp. Auth. v. Somerville, 451 Mass. 80, 86 (2008) (Somerville). See G. L. c. 161A, § 3 (i) (empowering MBTA "[t]o provide mass transportation service . . . on an exclusive basis, in the area constituting the authority"). Although taxing MBTA property when it is contracted out to private parties to operate

businesses for profit may affect the MBTA's negotiating power and thereby lower somewhat the revenues the MBTA would be able to receive from such private parties to support its provision of mass transportation services, such a possible reduction was certainly understood by the Legislature when it passed the specific exception to the MBTA's tax exemption.  Thus, it appears that the Legislature itself considered such an exception from the MBTA's exemption from taxation to be consistent with its essential function of providing mass transportation services.

The essential government function doctrine prohibits the regulation of "entities or agencies created by the Legislature in a manner that interferes with their legislatively mandated purpose, absent statutory provisions to the contrary."  Greater Lawrence Sanitary Dist. v. North Andover, 439 Mass. 16, 21 (2003).  As stated above, the essential function of the MBTA is to provide mass transportation services.  Somerville, 451 Mass. at 86.  We have also recognized that there is a "direct relation between the MBTA's provision of mass transportation services and the revenues that it must raise from nontransportation sources."  Id.  Indeed, by law, the MBTA is required to maximize revenues from all nontransportation revenue sources before raising fares.  See G. L. c. 161A, § 11.  Thus, "[r]evenue raised through advertisements is statutorily integrated with the MBTA's ability

to provide mass transportation services, its essential function." Somerville, 451 Mass. at 87.

That being said, the Legislature specifically carved out § 24's exception from the MBTA's tax exemption. See Somerville, 451 Mass. at 86 n.8 ("The Legislature almost certainly would not intend to exempt an entity from a regulation where the statute authorizing the regulation expressly applies to the type of entity in question"). In so doing, the Legislature also certainly recognized that there might be some effect on the revenues that the MBTA will be able to generate from its property. See generally Beacon S. Station Assocs., 85 Mass. App. Ct. at 308 (recognizing that 2013 amendment "explicitly narrow[ed] the exemption" in § 24). Taxing a user, lessee, or occupant of MBTA property pursuant to § 24 may affect the negotiating power of the MBTA and thus potentially lower the total amount of revenue available to the MBTA. This is because such a tax may affect the profits the private contractor will be able to generate from the property and, consequently, the amount they will be willing to bid for the property. If any such reduction in revenues constitutes an interference with the MBTA's essential governmental function, as Outfront is apparently arguing, then the essential governmental function doctrine would eviscerate §24's express exception.

We cannot adopt such an interpretation of the essential government function doctrine. Rather, we read the statutory scheme defining the rights and responsibilities of the MBTA, wherever possible, as a coherent, harmonious whole. See Boston Police Patrolmen's Ass'n v. Police Dep't of Boston, 446 Mass. 46, 50 (2006). Here the Legislature has defined not only the essential function of the MBTA, but also its revenue generating requirements and the exception to the MBTA's exemption from taxation for business conducted for profit on MBTA property. Given these unambiguous and express provisions, we have no reason to conclude that the Legislature considered such a potential limited reduction in revenue generating capacity to constitute an interference with the MBTA's ability to perform its essential function of providing mass transportation service. Cf. Boston v. Massachusetts Port Auth., 364 Mass. 639, 654 (1974) (in creating "comprehensive regulatory scheme" for reducing air pollution that explicitly applied to all State agencies, Legislature clearly intended air pollution regulations to apply to port authority despite general exemption from regulation conferred by enabling act).

Our decision in Somerville, which Outfront relies on, is readily distinguishable. In that case we were interpreting a statutory provision that expressly exempted the MBTA from the regulation in question, without any legislative exception to the

exemption.  Somerville, 451 Mass. at 85.[11]  To find an exception
to the exemption would have required us to infer such an
exception, which we declined to do.  Id. at 85-88.  See, e.g.,
Department of Community Affairs v. Massachusetts State Bldg.
Auth., 378 Mass. 418, 432 (1979).  Here, in contrast, we are
addressing an express legislative exception to an exemption.  As
we made clear in Somerville, where the Legislature has expressly
stated that the regulation at issue applies to the otherwise
exempt entity, such regulation is generally permissible.
Somerville, supra at 86 n.8.  The Legislature has itself refined
the essential government function of the otherwise exempt
entity.

In the instant case, the Legislature has chosen to subject
to taxation a particular use of MBTA property, that is, for a
business conducted for profit.  Although this may affect the
MBTA's negotiating positions and thereby limit somewhat the
revenues that the MBTA may generate from its property, we cannot
conclude that such a limitation, where expressly provided by the
Legislature, interferes with the essential function of the MBTA,

---

[11] The statute at issue was G. L. c. 161A, § 3 (i), which
states that the MBTA has the duty to "determine the character
and extent of the services and facilities to be furnished, and
in these respects their authority shall be exclusive and shall
not be subject to the approval, control or direction of any
state, municipal or other department, board or commission except
the [MBTA's] advisory board" (emphasis added).

which is to provide mass transportation services.  Rather we conclude that the Legislature has deemed this particular use of the property to be subject to taxation, because such taxation does not interfere with the essential function of the MBTA.

3.  <u>Conclusion</u>.  For the foregoing reasons, we affirm the decision of the board.

<u>So ordered</u>.