NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12021

SHRINE OF OUR LADY OF LA SALETTE INC.  vs.  BOARD OF ASSESSORS
OF ATTLEBORO.


Suffolk.      December 5, 2016. - March 22, 2017.

Present:  Gants, C.J., Lenk, Hines, Gaziano, Lowy, & Budd, JJ.


Taxation, Real estate tax:  abatement, Real estate tax:
    exemption, Real estate tax:  classification of property.
    Real Property, Tax.



Appeal from a decision of the Appellate Tax Board.

The Supreme Judicial Court granted an application for
direct appellate review.


Diane C. Tillotson (Ryan P. McManus also present) for the
taxpayer.
Michael R. Siddall (James M. Hannifan also present) for
board of assessors of Attleboro.
Heidi A. Nadel, for Massachusetts Council of Churches &
others, amici curiae, submitted a brief.
Felicia H. Ellsworth, Eric L. Hawkins, & William R.
O'Reilly, Jr., for Roman Catholic Archbishop of Boston & others,
amici curiae, submitted a brief.


GANTS, C.J.  This is an appeal from a decision of the

Appellate Tax Board (board) concerning property in Attleboro

owned by the taxpayer, Shrine of Our Lady of La Salette Inc. (Shrine). The Shrine sought a tax abatement from the board, claiming that certain portions of its property were exempt from taxation under G. L. c. 59, § 5, Eleventh (Clause Eleventh), the exemption for "houses of religious worship." The crux of the appeal is the scope of this exemption. For the reasons set forth below, we conclude that property is exempt from taxation under Clause Eleventh where the dominant purpose of the questioned portion of property is religious worship or instruction, or purposes connected with it. Applying this principle, we conclude that the board erred when it found that the Shrine's "welcome center" and maintenance building were not exempt under Clause Eleventh. We affirm its denial of an abatement for the former convent that the Shrine leased to a nonprofit organization for use as a safe house for battered women, and for the wildlife sanctuary that was exclusively managed by the Massachusetts Audubon Society in accordance with a conservation easement. The safe house and wildlife sanctuary might have been exempt from real estate taxation under G. L. c. 59, § 5, Third (Clause Third), as the property of a benevolent or charitable organization devoted to charitable use, had the Shrine satisfied the filing requirements for such an exemption, but they were not exempt under Clause Eleventh.[1]

_____

[1] We acknowledge the amicus brief jointly submitted by the

Background.  The Shrine is a Catholic religious organization affiliated with the Missionaries of Our Lady of La Salette (missionaries).  The missionaries are members of the Catholic faith who are inspired by what they believe to have been an apparition of the Virgin Mary (Our Lady) to two children in the village of La Salette, France, in 1846.  Following that event, supporters erected a shrine in La Salette to provide the many pilgrims who began traveling there each year a space to express their devotion.  Since then, members of the Catholic faith from around the world have erected shrines honoring Our Lady in their respective countries.  Although there are a number of these shrines throughout the world, each country is permitted only one designated national shrine.  The Shrine in Attleboro, which opened in 1953, became the national shrine for the United States in 2009.  Accordingly, thousands of people visit the Shrine each year, ranging from the lone visitor who stays for

Roman Catholic Archbishop of Boston, the Roman Catholic Bishop of Fall River, the Roman Catholic Bishop of Springfield, and the Roman Catholic Bishop of Worcester.  We also acknowledge the amicus brief jointly submitted by the Massachusetts Council of Churches; CAIR-Massachusetts; the Emanuel Gospel Center; the Episcopal Diocese of Massachusetts; the Episcopal Diocese of Western Massachusetts; the Islamic Society of Boston Cultural Center; the Massachusetts Conference of the United Church of Christ; the New England Conference of the United Methodist Church; the New England Region of the Unitarian Universalist Association; the New England Synod of the Evangelical Lutheran Church in America; Our Lady of Fatima Shrine, Holliston, Massachusetts; and the United Synagogue of Conservative Judaism; and joined by the New England Yearly Meeting of Friends and the Worcester Islamic Center.

only a moment to thousands of international pilgrims who stay for most of the day.

The Shrine is a Massachusetts not-for-profit organization whose purposes are described in its articles of organization as follows:

> "To promote the devotion to Our Lady of La Salette through the organization of public pilgrimages and through the administration of the Sacraments of the Church; to provide spiritual guidance to the pilgrims visiting the Shrine; to provide food and housing, if necessary, for the proper care of the pilgrims; to offer to said pilgrims the opportunity of purchasing religious articles and books of all kinds; to seek contributions for the development and support of said Shrine; to use any or all of said funds for the religious education of young men training for religious and missionary priesthood; to provide funds to further foreign missions; and to do such further acts as are necessary and incidental to the carrying out of the purposes hereinbefore set forth."

In keeping with the Shrine's purposes, visitors and pilgrims can participate in a range of activities on the Shrine's property. Each day, the Shrine holds a Mass and provides the opportunity for confession. In addition, it offers specialized prayer services and prayer groups at various times. Each year, nearly 400,000 visitors make their way to the Shrine between Thanksgiving and early January for its Festival of Lights, during which the Shrine erects Christmas displays and hangs approximately 400,000 Christmas lights. In addition to these events, the Shrine hosts a variety of other functions and activities, including retreats, concerts, and fundraisers.

In 2012, the fiscal year at issue, the Shrine carried out its operations on 199 acres of property it owned in the city of Attleboro (city). This case arises out of the city assessor's determination that the Shrine owed property taxes in the amount of $92,292.98, based on a valuation of $12,815,800, the taxable portion of which was valued at $4,955,740. The Shrine paid its property tax, with interest, and in January, 2013, filed an application for abatement, which the city's board of assessors (assessors) denied in April, 2013. The Shrine appealed to the board, arguing that all of its property was exempt under Clause Eleventh.[2]

The board, for purposes of its analysis, divided the Shrine's property into eight distinct portions: (1) the Shrine's church, (2) the indoor and outdoor chapels, (3) the monastery, (4) the retreat center, (5) the welcome center and surrounding land, (6) the maintenance building, (7) the former convent, which was leased to a nonprofit organization that uses the building as a safe house for battered women (safe house), and (8) approximately 110 acres of "unimproved land" known as

---

[2] The Shrine of Our Lady of La Salette Inc. (Shrine) also claimed an exemption under G. L. c. 59, § 5, Third, which exempts from taxation the real and personal property of a "charitable organization" where the property is "occupied by it or its officers for the purposes for which it is organized." However, the Shrine later waived this claim after conceding that it had failed to file the forms required to obtain such an exemption.

the Attleboro Springs Wildlife Sanctuary (wildlife sanctuary). The board determined that the first four portions of the property (the church, the chapels, the monastery, and the retreat center, including the surrounding land and parking areas) were exempt under Clause Eleventh. It determined that the welcome center was only partially exempt and that the maintenance building, safe house, and wildlife sanctuary were fully taxable. The Shrine appeals these latter four determinations, so we describe at length the board's findings regarding these portions of the property.

1. <u>Welcome center</u>. A typical pilgrimage to the Shrine begins in the welcome center, where pilgrims and visitors are shown a video presentation about Our Lady of La Salette. After a visit to the Shrine church to pray or to the chapel for confession, visitors return to the cafeteria in the welcome center for lunch.[3] The cafeteria also "functions as a soup kitchen serving free meals to the poor every Monday, and it is used on occasion as overflow space in which to host a lecture or workshop offered by the [S]hrine." Visitors can also visit the "bistro" in the welcome center, where a more limited menu of food is available for purchase from noon to 5 P.M. each day.

_____

[3] The cafeteria does not charge pilgrims for lunch, apart from a donation fee made in connection with the pilgrimage, and it is not generally open to the public to purchase meals, except during the Christmas Festival of Lights and during the season of Lent.

The Shrine's gift shop is located in the welcome center, where visitors can purchase religious items such as books, statues, and rosary beads. The Shrine also offers other religious lectures and programs in various spaces within the welcome center.

In addition, the Shrine uses the welcome center and surrounding land for various fundraising activities, including "yard sales, a carnival, a circus, a clambake, and a Christmas Bazaar." The Shrine sometimes hosted these events in partnership with third parties, including various artists, vendors, and, in at least one instance, a for-profit entertainment company. The events yielded various amounts for the Shrine, ranging from $2,000 to $10,000.[4]

The Shrine also grants access to the welcome center and surrounding land to various public, religious, and nonprofit groups for various events, and to private groups and individuals for private functions. For instance, the welcome center has been used by the city as a polling station during elections, by the Lions Club for an antique car show fundraiser, by a Native American group for a powwow, and by the American Red Cross for a blood drive. In addition, the Shrine has leased the welcome

---

[4] The Shrine operated the carnival in connection with a for-profit entertainment company. The company received sixty per cent of the profits, and the Shrine received forty per cent, yielding $10,000 for the Shrine.

center to "a family for a baptismal party; . . . a family for a wedding rehearsal dinner; . . . and . . . a for-profit transportation company for a presentation on religious tours and travel." Typically, these groups made donations ranging from $200 to $1,000 to the Shrine in return for the use of the space, but the Shrine allowed the American Red Cross to use the space for free.

The board determined that the Shrine "used [the welcome center and surrounding land] in part for 'religious worship or instruction,' and in part for other purposes, such as fundraising activities and private functions." The board found that the assessors were correct to tax the welcome center using a prorated or apportioned basis, wherein the assessors calculated taxes due according to the percentage of time each portion was used for secular rather than religious activity. The board agreed with the assessors' determination that the welcome center and surrounding land were taxable at forty per cent of their value and sixty per cent exempt.

2. Maintenance building. The Shrine used the maintenance building to store "display items for the Festival of Lights during the off season; inventory for the gift shop; and golf carts and other maintenance vehicles and equipment used on the subject property." The board found the building fully taxable because it was not used for "'religious worship or instruction'

within the meaning of Clause Eleventh," and it was "immaterial" whether the building furthered the Shrine's charitable purposes if those purposes did not constitute religious worship or instruction.

3. Safe house. The Shrine leased the former convent to a nonprofit organization that uses the building as a safe house for battered women. The board found it fully taxable because it was no longer a parsonage and was not being used for "religious worship or instruction." The board noted that the safe house's furtherance of a charitable purpose may have qualified this portion of the property for an exemption under Clause Third, had the Shrine filed the required documents for this exemption. See note 2, supra.

4. Wildlife sanctuary. The board found that, in 2009, the Shrine granted the Massachusetts Audubon Society a conservation easement over the wildlife sanctuary,[5] and that organization subsequently managed it in accordance with the easement "as an area containing open space and walking trails and available to the public for passive recreation." The board found that the wildlife sanctuary was not being used for religious worship or instruction, and noted that its furtherance of a charitable

---

[5] The Shrine later transferred the fee interest to the Massachusetts Audubon Society, but was the owner of record for the fiscal year at issue.

purpose may have qualified it for an exemption under Clause Third had the Shrine filed the required documents.

The board concluded "that the assessors properly exempted so much of the subject property that qualified for the exemption under Clause Eleventh," and that the Shrine "failed to prove its entitlement to an abatement."  The Shrine appealed from the board's determination, and we granted its application for direct appellate review.

Discussion.  General Laws c. 59, § 2, articulates the general rule that "[a]ll property, real and personal, . . . unless expressly exempt, shall be subject to taxation."  The specific exemptions from taxation are enumerated in G. L. c. 59, § 5.  At issue here is the interpretation of the scope of Clause Eleventh, which exempts from taxation:

> "[H]ouses of religious worship owned by, or held in trust for the use of, any religious organization, and the pews and furniture and each parsonage so owned . . . for the exclusive benefit of the religious organizations, . . . but such exemption shall not, except as herein provided, extend to any portion of any such house of religious worship appropriated for purposes other than religious worship or instruction.  The occasional or incidental use of such property by an organization exempt from taxation under the provisions of [26 U.S.C. § 501(c)(3)] of the Federal Internal Revenue Code shall not be deemed to be an appropriation for purposes other than religious worship or instruction."

Exemption statutes, such as Clause Eleventh, are "strictly construed, and the burden lies with the party seeking an exemption to demonstrate that it qualifies according to the

express terms or the necessary implication of a statute providing the exemption." New England Forestry Found., Inc. v. Assessors of Hawley, 468 Mass. 138, 148-149 (2014), citing Milton v. Ladd, 348 Mass. 762, 765 (1965). "We uphold findings of fact of the board that are supported by substantial evidence. We review conclusions of law, including questions of statutory construction, de novo." New England Forestry Found., Inc., supra at 149, citing Bridgewater State Univ. Found. v. Assessors of Bridgewater, 463 Mass. 154, 156 (2012). We give weight to the board's interpretation of tax statutes, however, because the "board is an agency charged with administering the tax law and has 'expertise in tax matters.'" AA Transp. Co. v. Commissioner of Revenue, 454 Mass. 114, 119 (2009), quoting RHI Holdings, Inc. v. Commissioner of Revenue, 51 Mass. App. Ct. 681, 685 (2001). But "principles of deference . . . are not principles of abdication." Commissioner of Revenue v. Gillette Co., 454 Mass. 72, 75-76 (2009), quoting Duarte v. Commissioner of Revenue, 451 Mass. 399, 411 (2008). "Ultimately, . . . the interpretation of a statute is a matter for the courts." Onex Communications Corp. v. Commissioner of Revenue, 457 Mass. 419, 424 (2010).

In interpreting the scope of Clause Eleventh, we recognize that a house of religious worship is more than the chapel used for prayer and the classrooms used for religious instruction.

It includes the parking lot where congregants park their vehicles, the anteroom where they greet each other and leave their coats and jackets, the parish hall where they congregate in religious fellowship after prayer services, the offices for the clergy and staff, and the storage area where the extra chairs are stored for high holy days.  In some houses of religious worship, all of these portions of property (apart from the parking area) may be located with the chapel in a single building; in others with larger congregations, they may be located in multiple buildings, some adjoining the chapel, some standing alone.  We have long recognized that all of these portions of property are exempt from taxation under Clause Eleventh even if no religious worship occurs within these spaces; it suffices that they are used for "purposes connected with" religious worship, Proprietors of the S. Congregational Meetinghouse in Lowell v. Lowell, 1 Met. 538, 541 (1840), or, otherwise stated, purposes that "normally accompany and supplement the religious work of a parish."  Assessors of Framingham v. First Parish in Framingham, 329 Mass. 212, 215 (1952).

The Shrine is indisputably a house of religious worship, but it is not a typical one, because it is not a parish with a congregation but a national shrine of the Missionaries where thousands of pilgrims and visitors come for prayer, confession,

religious retreats, and religious education, and, during the Christmas season, to find religious inspiration from its Festival of Lights. We address separately the four portions of property at issue on appeal.

1. Welcome center. The board recognized that the welcome center was used at times for "religious worship or instruction" because religious lectures or programs were offered, but it also found that the welcome center was used for purposes other than "religious worship or instruction," such as fundraising activities, including a Christmas Bazaar. The board also found that "religious worship or instruction" did not occur in the bistro or gift shop, "though they may have served to promote the [Shrine's] religious purposes in general." The board concluded that, where properties owned by religious organizations are used only in part for "religious worship or instruction," Clause Eleventh "allows" them "to be taxed on an apportioned basis."

The board defined far too narrowly the scope of the religious exemption. A video presentation about Our Lady of La Salette plainly is religious instruction. Pilgrims and visitors who spend hours at the Shrine need to eat and drink, so the cafeteria and bistro are "connected with" religious worship, and "accompany and supplement" the religious work of the Shrine by sparing pilgrims and visitors the need to bring their own food and drink or leave the Shrine in order to find it. See

Assessors of Framingham, 329 Mass. at 215; Proprietors of the S. Congregational Meetinghouse in Lowell, 1 Met. at 541.  Those who are inspired by the Shrine may obtain religious objects and books at the gift shop that might allow them to continue their religious worship and instruction when they leave.  The fact that money earned from the cafeteria, bistro, and gift shop may help pay for the Shrine's expenses does not remove them from the realm of religious worship and instruction; even a church cannot live on prayer alone.

Nor is it appropriate for the board to tax the welcome center "on an apportioned basis" based on the assessor's estimation of the percentage of nonreligious use of the welcome center.  By the board's logic, a church whose parish hall is used for occasional bake sales, rummage sales, and holiday bazaars to raise money for the church, and the occasional wedding reception, could have its parish hall taxed on an apportioned basis based on an assessor's estimation of the percentage of its use that is not for "religious worship or instruction."  Clause Eleventh, however, provides that the exemption shall not "extend to any portion of any such house of religious worship appropriated for purposes other than religious worship or instruction."  By choosing the word "appropriated," the Legislature expressed its intent that a portion of a house of religious worship shall either be exempt or not exempt, based

on its "dominant purpose."  See Assessors of Framingham, 329 Mass. at 216 ("[t]he right of exemption from taxation . . . depends on the dominant purpose for which the rooms are maintained and their actual use for that purpose").

The dominant purpose test thus considers, as to each portion of church property, whether its dominant purpose is religious worship or instruction or connected with religious worship or instruction (and is therefore exempt from taxation), or whether its dominant purpose is something other than religious worship or instruction (and therefore has been "appropriated for purposes other than religious worship or instruction").  See Assessors of Framingham, 329 Mass. at 216; G. L. c. 59, § 5, Eleventh.  See generally 4 W.W. Bassett, W.C. Durham, Jr., & R.T. Smith, Religious Organizations and the Law § 17:90 (2013) ("primary use" standard has been "almost universally adopted" by States in determining property tax exemptions for religious institutions).

We do not infer from the revision of Clause Eleventh in 1980 (which added the provision that "[t]he occasional or incidental use of such property by an organization exempt from taxation under the provisions of [26 U.S.C. § 501(c)(3) of the Internal Revenue Code] shall not be deemed to be an appropriation for purposes other than religious worship or instruction") that the Legislature intended that the occasional

or incidental use of property by a person or entity other than a nonprofit organization shall be deemed such an appropriation. See 1980 House Doc. No. 6373. The addition of this provision should be read to reflect nothing more than a legislative intent to assure religious institutions that they do not risk their tax exemption by allowing nonprofit organizations occasionally to use their facilities for meetings and events. It cannot reasonably be read to suggest a rejection of the dominant purpose test articulated prior to this statutory revision in Assessors of Framingham, which affirmed that the exemption applied to a church building that had occasionally been used for wedding receptions, auction sales, and card parties, as well as meetings of organizations that were likely not tax-exempt nonprofit organizations. See Assessors of Framingham, 329 Mass. at 213-214, 216.

In conclusion, the board committed an error of law in failing to apply the dominant purpose test to the welcome center. Because the dominant purpose of the welcome center is "connected with" religious worship and instruction, and "accompan[ies] and supplement[s]" the religious work of the Shrine, we conclude that it should have been entirely exempt under Clause Eleventh. See Assessors of Framingham, 329 Mass. at 215; Proprietors of the S. Congregational Meetinghouse in Lowell, 1 Met. at 541.

2.  Maintenance building.  The board found that the maintenance building is used to store display items for the Festival of Lights during the off season, inventory for the gift shop, and maintenance vehicles used on the Shrine's property. In essence, the maintenance building is the equivalent for a larger church of the storage cellar or storage shed of a smaller church, and is similarly connected with the religious work of the Shrine.  The Festival of Lights during the Christmas season is part of the Shrine's celebration of Christmas, so the storage of lights in the off season is a purpose connected with religious worship.  See Assessors of Framingham, 329 Mass. at 216.  As earlier noted, the gift shop is also connected with religious worship and instruction, so the storage of its inventory is a purpose connected with such worship and instruction.  Maintenance vehicles assist Shrine staff in maintaining the Shrine and its grounds, so the storage of these vehicles is also connected to religious worship and instruction. The board correctly found that the parking lot of the Shrine was exempt from taxation; the building where the maintenance vehicles are kept that are used to clear that parking lot from snow and ice in the winter were equally exempt.  Because the dominant purpose of the maintenance building is connected with the religious worship and instruction offered at the Shrine, we

conclude that the board erred in declining to find it exempt from taxation under Clause Eleventh.

3. <u>Safe house</u>.  The Shrine argues that the portion of its property leased to a nonprofit organization and used as a safe house for battered women should have been exempt because it was incidental to the over-all use of the Shrine's property as a place of religious worship and instruction, and because it furthered the Shrine's religious mission of performing charitable deeds in the community.  We disagree for three reasons.

First, we decline to adopt the Shrine's argument that the dominant purpose test is an "all or nothing" test regarding the exemption of church property, i.e., that an assessor must look at the entirety of a church's property and determine whether the dominant purpose of that property is religious worship or instruction, such that the entirety of the property is either exempt or not.  Clause Eleventh, in providing that the exemption shall not "extend to any portion of any such house of religious worship appropriated for purposes other than religious worship or instruction," expressly recognizes that the exemption analysis must focus separately on each "portion" of a house of religious worship.  This court conducted such an analysis in <u>Proprietors of the S. Congregational Meetinghouse in Lowell</u>, 1 Met. at 540-541, where the second floor of a building erected by

a "religious society" was used as a place of worship and a vestry, and six "tenements" on the first floor were rented as commercial stores, with the income from the rentals used to pay the money borrowed to purchase the land and erect the building. The court held that "the exemption in the statute extended to that part of the property only which was used as a place of worship, and for purposes connected with it . . . such as the vestry, the furnace and the like . . . but did not extend to separate tenements used for purposes exclusively secular." Id. at 541. The appropriate analysis focuses on whether the dominant purpose of each portion of the property, rather than the property as a whole, is religious worship or instruction.

Second, we recognize that religion embraces charitable deeds and providing help to those in need, but we also recognize that the Legislature did not include within the scope of Clause Eleventh "any portion of any . . . house of religious worship appropriated for purposes other than religious worship and instruction" (emphasis added). Here, the nonprofit organization's use of the property as a safe house was "permanent and exclusive," see Assessors of Framingham, 329 Mass. at 216, rather than "occasional or incidental." See G. L. c. 59, § 5, Eleventh. Where a house of religious worship grants a "permanent and exclusive" lease of a portion of its property to a nonprofit organization to perform a charitable mission,

rather than religious worship or instruction, we conclude that this portion of its property was "appropriated for purposes other than religious worship and instruction" under Clause Eleventh.

Our conclusion is strongly supported by the legislative history regarding the amendment to Clause Eleventh enacted in 1980 that inserted the provision making clear that the "occasional or incidental use" by a nonprofit organization of a portion of a house of religious worship's property "shall not be deemed to be an appropriation for purposes other than religious worship or instruction." The original version of the bill would have extended the exemption to "any portion . . . appropriated for the purpose of any [nonprofit organization]." 1980 House Doc. No. 3699. The Governor returned the bill to the Legislature, declaring that he agreed with the bill's underlying purpose to ensure religious institutions the ability to allow "charitable organizations of the community [to] use their rooms or facilities without fear of exemption loss," but was concerned that the bill was "much too broad" because "[i]t would grant tax exemption to the permanent and exclusive non-religious use of church owned property." See 1980 House Doc. No. 6373. The resulting amendment allows nonprofit organizations, many of which are charitable organizations, to use property owned by houses of religious worship without risk to the exemption so

long as that use was merely occasional and incidental.  Compare G. L. c. 59, § 5, Eleventh, as amended through St. 1980, c. 411, with 1980 House Doc. No. 3699.

Third, the Legislature expressly provides an exemption from taxation for the real and personal property of a charitable organization occupied for a charitable purpose, but that exemption is under Clause Third, not Clause Eleventh.  Had the Shrine timely filed the documents required under Clause Third, it might have obtained an exemption for the safe house.  The Shrine cannot avoid its obligation to file these documents under Clause Third by claiming that charitable deeds fall within the rubric of religious worship and education under Clause Eleventh.

4.  <u>Wildlife sanctuary</u>.  For essentially the same reasons that we affirm the board's determination regarding the safe house, we affirm its determination that the wildlife sanctuary was fully taxable.  The Shrine notes that it used the sanctuary for meditative walks and granted a conservation easement to the Massachusetts Audubon Society in 2009 to "promote . . . ecospirituality and reconciliation with the creation."  The easement grants general rights of access to the public while reserving access rights for those affiliated with the Shrine.  According to the Shrine, the easement's express purpose, coupled with the Shrine's use of the property for meditative walks, establish that the Shrine used this property for religious

worship, and any secular use of the property was incidental to this purpose.  But under the terms of the easement, the Shrine transferred to the Society the "exclusive right and responsibility to manage the [wildlife sanctuary]" and perform a range of conservation-related activities (emphasis added).  This grant of access to a nonprofit organization, coupled with unrestricted public access rights, represents a "permanent and exclusive" appropriation of this portion of the Shrine's property for a dominant charitable purpose.

We appreciate that a wildlife sanctuary may be for some a spiritual sanctuary, much as working in a safe house may be for some the realization of a spiritual mission.  But the Legislature did not intend either a wildlife sanctuary or a safe house, when used and operated as they were here, to qualify as a house of religious worship.  Where their dominant purpose is charitable, both might have been exempt from taxation under Clause Third, but neither was exempt under Clause Eleventh.

Conclusion.  For the reasons stated above, we reverse the board's determination under Clause Eleventh that the welcome center was taxable in part and that the maintenance building was taxable in full, and affirm the board's determination that the safe house and the wildlife sanctuary were subject to taxation.  We remand the case to the board for a determination regarding the amount of the abatement.

So ordered.