SUPREME JUDICIAL COURT 
 
 480 McCLELLAN LLC vs. BOARD OF ASSESSORS OF BOSTON

 
 Docket:
 SJC-13671
 
 
 Dates:
 December 2, 2024 - February 12, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Wendlandt, Georges, Dewar, & Wolohojian, JJ.
 
 
 County:
 Suffolk
 

 
 Keywords:
 Massachusetts Port Authority. Taxation, Massachusetts Port Authority, Appellate Tax Board: findings, Assessors, Abatement, Exemption, Leased property. Real Property, Tax. Constitutional Law, General Court, Governor, Taxation. General Court. Governor. Parliamentary Procedure. Statute, Construction. Words, "Leased for business purposes."
 
 

             Appeal from a decision of the Appellate Tax Board.
            The Supreme Judicial Court granted an application for direct appellate review.
            Jonathan M. Albano (Matthew D. Schnall & Andrew M. Buttaro also present) for the taxpayer.
            Anthony M. Ambriano for board of assessors of Boston.
            Joel G. Beckman, Michael Paris, Joshua E. Goldstein, & Kileigh E. Stranahan, for Massachusetts Port Authority, amicus curiae, submitted a brief.
            WENDLANDT, J.  The taxpayer, 480 McClellan LLC (taxpayer), contends that, unbeknownst to the Legislature, more than a score[1] and ten years ago the Legislature completed the steps mandated by Part II, c. 1, § 1, art. 2, of the Constitution of the Commonwealth (article 2), to override the Governor's veto and enacted a provision (section 53) of the 1993 supplemental appropriations bill (1993 bill) that substantially changed how lessees of land owned by the Massachusetts Port Authority (Massport) are taxed under the Massport enabling act, G. L. c. 91 App., §§ 1-1 et seq., inserted by St. 1956, c. 465, §§ 1 et seq. (act).  In particular, the taxpayer maintains that, following the vote of the House of Representatives to override the Governor's veto, the Senate's initial vote to do the same finalized the Legislature's constitutionally mandated "reconsider[ation]" of section 53.  Part II, c. 1, § 1, art. 2.  The resulting Lazarus[2]-like awakening of this provision, the taxpayer asserts, exempts it from taxation because, under the terms of its lease with Massport, it uses the property predominantly for "air transportation purposes," a tax-exempt use under section 53.
            Guided by the Senate's rules and the Legislature's long-standing procedures and established practices, we conclude that, in view of a timely motion to reconsider, the Senate's initial vote did not "approve[]" section 53 in the constitutional sense.  Part II, c. 1, § 1, art. 2.  And because the pending motion to reconsider was not resolved before the end of the legislative session, section 53 did not acquire the "force of . . . law."  Id.
            Applying G. L. c. 91 App., § 1-17 (section 17), the (unamended and) long-controlling section of the act that governs taxation of lessees of Massport property, we affirm the decision of the Appellate Tax Board (board), which determined that the disputed tax assessment was proper because the taxpayer, a for-profit real estate investment and management company, leased the land for "business purposes."[3]
            1.  Factual background.[4]  In 1990, Massport acquired real property located at 480 William F. McClellan Highway in the East Boston section of Boston (property).  The property consists of approximately 222,230 square feet of land.  Although the property was taxable prior to its acquisition, Massport has been exempt from paying taxes on it under section 17.[5]
            In 2003, Massport entered into an agreement with the taxpayer's predecessor in interest to lease the property (ground lease).  Under the terms of the ground lease, the predecessor in interest was to construct a warehousing and freight forwarding facility (cargo facility), office space, and parking, and to make those facilities accessible from the adjacent McClellan Highway.  Title to those improvements were to vest in the predecessor in interest, and the predecessor in interest was required to use the property for the operation of, inter alia, "an intermodal freight, office and warehous[e] facility."
            Two years later, in 2005, the predecessor in interest assigned the ground lease to the taxpayer in consideration of, inter alia, $7 million; with Massport's consent, the taxpayer assumed all the obligations and benefits of the predecessor in interest, including the obligation to construct and the right to own improvements such as the cargo facility and office space.[6]  Prior to the assignment, Massport set forth in a letter to the taxpayer its understanding "that cargo facilities on Massport's property, such as the project described in the [ground l]ease, are essential supporting facilities to the operations of the port of Boston and Logan International Airport, and constitute an essential governmental function provided by Massport."  The property now is improved by a building containing nearly 141,000 square feet of rentable space.
            In 2017, the city of Boston (city) levied a tax on the property;[7] the city continued to levy a tax on the property in subsequent years, including in 2020, the tax year at issue.
            2.  Procedural history.  Following the 2017 property tax assessment, the taxpayer sought an abatement from the city's board of assessors (assessors).  It similarly sought abatement from property taxes subsequently levied in 2018, 2019, and 2020.  The assessors denied the taxpayer's applications, and the taxpayer timely appealed to the board.
            On the parties' cross motions for summary judgment as to the abatement application for the tax year at issue,[8] and after inviting the parties to address the effect, if any, of section 53 of the 1993 bill,[9] the board allowed summary judgment in favor of the assessors.  The taxpayer filed a timely notice of appeal and applied for direct appellate review in this court, which we allowed.
            3.  Discussion.  a.  Senate's reconsideration of section 53.  The taxpayer first maintains that it is exempt from taxation under section 53 of the 1993 bill because the ground lease required it to construct and operate a cargo facility; the property is therefore used for "air transportation purposes," which section 53 exempts from taxation.  The success of the taxpayer's claim turns on whether section 53 was enacted over the Governor's veto during the 1993 legislative session.
            i.  Standard of review.  The board concluded that section 53 did not amend section 17, which is the provision of the act governing how Massport lessees are taxed.  See discussion infra.  We review the board's decision in this regard de novo.  See Shrine of Our Lady of La Salette Inc. v. Assessors of Attleboro, 476 Mass. 690, 696 (2017) ("We review conclusions of law . . . de novo").
            ii.  Statutory framework.  The Legislature created Massport as a "body politic and corporate" and a "public instrumentality" of the Commonwealth in 1956, inter alia, to consolidate operation and maintenance of, and investment in, Logan Airport and the port of Boston.  G. L. c. 91 App., § 1-2.  See St. 1956, c. 465, §§ 1 (b), (k), 3 (g).  In addition to Logan Airport, it owns, operates, and maintains L.G. Hanscom Field, Worcester Regional Airport, the Conley Freight Terminal, the Flynn Cruiseport in the South Boston section of Boston, and other real estate holdings in the South Boston, East Boston, and Charlestown sections of Boston.  While Massport operates and maintains some of its real estate holdings, a substantial portion is leased to tenants.  See Massachusetts Port Authority, 2022 Annual Report, at 14.
            A.  Section 17 of the act.  Section 17 of the act governs the tax treatment of Massport-owned properties.  It provides, in relevant part:
"[Massport] shall not be required to pay any taxes or assessments upon any project or any property acquired or used . . . by [Massport] under the provisions of this act, . . . and no property of [Massport] shall be taxed to a lessee thereof under [G. L. c. 59, § 2B];[10] provided, however, that anything herein to the contrary notwithstanding, . . . lands acquired by [Massport] which were subject to taxation on the assessment date next preceding the acquisition thereof, shall, if leased for business purposes, be taxed by the city . . . to the lessees thereof, . . . in the same manner as the lands and the buildings thereon would be taxed to such lessees if they were the owners of the fee" (emphases added).
G. L. c. 91 App., § 1-17.  Thus, under section 17, a lessee of Massport's property is not taxable under G. L. c. 59, § 2B (section 2B), the provision that, as noted infra, generally governs how lessees of property owned by the Commonwealth are taxed.  Instead, section 17 subjects a lessee of certain Massport-owned property to taxation -- namely, property that was taxable immediately prior to its acquisition by Massport[11] -- but only if the property is "leased for business purposes."  G. L. c. 91 App., § 1-17.  Such a lessee "shall" be taxed as if the lessee were the property's owner.  Id.
            B.  Section 53 of the 1993 bill.[12]  Section 53 of the 1993 bill1[3 ]would have amended section 17 to exempt from taxation under section 2B only lessees of Massport property "used for air transportation purposes"; presumptively, Massport lessees using Massport property for other purposes would have been taxed under section 2B.[14]  House Bill No. 5379, § 53 (Aug. 9, 1993).  Moreover, even lessees using Massport property for air transportation purposes would be taxed under the amended section 17 for Massport property if they also "leased [the property] for business purposes other than air transportation."  Id.
            The 1993 bill passed both chambers of the Legislature and was sent to the Governor for his consideration.  See note 13, supra.  The Governor vetoed several sections of the 1993 bill, including section 53.  As to section 53, he explained, "This section would allow cities and towns to levy new property taxes on businesses that operate commercial enterprises on Massachusetts Port Authority property.  Passage of this section would create a disincentive for development of authority property.  Massport already makes payments in lieu of taxes,[15] and also generates substantial business activity that benefits its host communities."  1993 House Doc. No. 5445, at 8.
            The portions of the 1993 bill vetoed by the Governor, including section 53, along with his written objections, were returned to the House of Representatives, where the 1993 bill had originated.  See note 13, supra.  Upon reconsideration, more than two-thirds of the House voted to pass section 53 over the Governor's veto.  1993 House J. 1177-1178.
            Section 53 then was sent to the Senate for its reconsideration in view of the Governor's veto.  A two-thirds majority of the Senate (twenty-six yeas and thirteen nays) also voted initially to override the Governor's veto.  1993 Senate J. 1315.  The Senate Journal entry from that day states, "The yeas and nays having been completed . . . , section 53 stands, in concurrence, notwithstanding the disapproval of His Excellency the Governor, two-thirds of the members present having approved the same."  Id.
            Immediately after the vote, however, a senator who had voted against the override timely moved to reconsider pursuant to Rule 5316 of the Rules of the Senate; the Senate Journal reflects the motion, noting that "under [Rule 53], the motion to reconsider was placed first in the Orders of the Day for the next session."  1993 Senate J. 1315.
            Accordingly, the Senate considered the motion to reconsider on the next legislative day, October 12, 1993; however, the Senate did not vote on the motion and postponed further action on it until October 19, 1993.  See 1993 Senate J. 1331-1332.  The Senate considered and then postponed action on the motion six more times.  See id. at 1369-1370 (Oct. 19, 1993); id. at 1401-1402 (Oct. 26, 1993); id. at 1426 (Nov. 3, 1993); id. 1501-1502 (Nov. 15, 1993); id. at 1609-1610 (Dec. 6, 1993); id. at 1838-1839 (Jan. 3, 1994).
            The final Senate Journal entry addressing the motion, dated January 3, 1994, states, "Pending the motion to reconsider . . . the further consideration thereof was postponed until the next session."  1993 Senate J. 1839.  The Senate's bill history for the 1993 bill concludes, "No further action taken on the disapproval of [s]ection 53."  1993 Senate Bill History 2688.  On the following day, Tuesday, January 4, the 1993 legislative session ended.  See art. 10 of the Amendments to the Massachusetts Constitution ("the general court shall be dissolved on the next day preceding the first Wednesday of January").
            iii.  Motion to reconsider.  When a governor vetoes a bill, article 2 requires the Governor to return the bill, with written objections, to the Legislature for its reconsideration.  Part II, c. 1, § 1, art. 2.  If a two-thirds majority of the chamber in which the bill originated reapproves the bill, the bill moves to the other chamber for reconsideration; if the second chamber also "approve[s]" the bill by a two-thirds majority of the members present, then it "shall have the force of a law."  Id.[17  Article 2 sets forth that "the votes of both houses shall be determined by yeas and nays; and the names of the persons voting for, or against, the said bill or resolve, shall be entered upon the public records of the commonwealth."  Id.  The Constitution is otherwise silent as to the procedural steps the Legislature must adopt for purposes of reconsideration and final approval of a provision vetoed by a governor.  See Kay Jewelry Co. v. Board of Registration in Optometry, 305 Mass. 581, 585 (1940).
            The taxpayer contends that once the Senate initially voted by a two-thirds majority to override the Governor's veto, the Senate "reconsidered" and finally "approved" section 53 as required by article 2, see Part II, c. 1, § 1, art. 2; in the taxpayer's view, under article 2, the filing of a motion for reconsideration did not disturb the finality of this vote even if permitted by the Senate rules.  In short, the taxpayer maintains that the motion to reconsider was a nullity.
            The taxpayer's argument has some initial appeal.  After all, article 2 states that a vetoed measure "shall . . . be reconsidered, and if approved by two thirds of the members present, [it] shall have the force of a law."  Part II, c. 1, § 1, art. 2.  And here, section 53 initially garnered the requisite votes.  Still, we decline to adopt the taxpayer's construction, which runs counter to the Legislature's own understanding of its procedures following a governor's veto.
            The requirement, under article 2, that a vetoed bill be returned to the Legislature to be reconsidered "signifies . . . that the bill is to be again before the legislative body for further consideration."  Kay Jewelry Co., 305 Mass. at 585.  And we have long acknowledged that "[i]t has been the practice of the Legislature of this Commonwealth to permit reconsideration of [an initial vote on] the question of passing a bill over a governor's veto."  Id.[18]  A motion to reconsider permits, inter alia, "time for further thought" and an opportunity for members absent from the first vote to weigh in.  Opinion of the Justices, 334 Mass. 745, 754 (1956).  See Opinion of the Justices, 291 Mass. 578, 584 (1935) (reconsideration permits "further reflection, renewed attention, and more careful deliberation").  Article 2 does not require that this further reflection and consideration through a timely motion for reconsideration be short circuited where, as here, the Senate determines, under its procedural rules, that more time is warranted.
            Indeed, article 2 imposes no limitations on the Legislature's consideration of vetoed measures, except that the votes must be "by yeas and nays," and that the vote of each member must be recorded; by its plain terms, article 2 does not dictate when the Legislature's consideration of whether to override a veto is final.  See Kay Jewelry Co., 305 Mass. at 585.  Accordingly, the Legislature is free to determine, through its own rules and established practices, when it has taken final action on a veto override.  See, e.g., id. ("the extent and manner of that further reconsideration [under article 2] are left to the legislative body and are subject to its rules").  See also Opinion of the Justices, 291 Mass. at 583 ("Final legislative action" under art. 48 of Amendments to Massachusetts Constitution "means such action according to established legislative procedure"); Nevins v. City Council of Springfield, 227 Mass. 538, 545 (1917) (statute establishing ordinance "shall be in force" if mayor's veto overridden "refer[s] to the decisive vote as finally ascertained and declared according to the parliamentary usages of the body voting, and not necessarily the first vote if such vote is subject to reconsideration").
            Moreover, the Constitution expressly provides the Legislature the authority to promulgate its own procedural rules.  See Part II, c. 1, § 2, art. 7, of the Constitution of the Commonwealth (Legislature "shall . . . determine its own rules of proceedings").  Among the Senate's procedural rules is one permitting a motion to reconsider a vote.  See Rule 53 of the Rules of the Senate, in Manual for the General Court, 1993-1994, at 584-585.
            In sum, the Constitution does not bar a motion to reconsider a vote, including a veto override vote, if that motion is consistent with the Legislature's procedural rules and established practices.  See Kay Jewelry Co., 305 Mass. at 585.  The initial vote in the Senate to override the Governor's veto of section 53 did not end the Senate's reconsideration of the measure in a constitutional sense once the timely motion to reconsider was made under Rule 53.[19]  At that point, the Senate had not finalized its reconsideration of section 53, and the measure was not "approved" as required by article 2.
            iv.  Effect of end of legislative session.  The taxpayer next asserts that, even if the motion to reconsider disturbed the finality of the Senate's initial vote, as we conclude it did, the Senate's failure to dispose of the motion before the end of the legislative session meant that the Senate's initial vote to override the Governor's veto sprung back to life, and section 53 was approved.  In support of its argument, the taxpayer relies on general sources of parliamentary rules of procedure, which provide that, when a motion to reconsider is not acted upon by the close of a legislative session, the motion expires, and the original vote is restored.[20]
            "Caution should be used in applying general statements in manuals of parliamentary law to the proceedings of a body like the General Court which has its own traditions and practices."  Opinion of the Justices, 334 Mass. at 754-755.  The General Court's rules governing reconsideration motions "are not in all respects in accord with what is commonly stated to be the general parliamentary law."  Id. at 754.  Indeed, Rule 62 of the Rules of the Senate makes plain that extrinsic rules of parliamentary practice do not govern the Senate if they are inconsistent with the Senate's own rules.  See Manual for the General Court, 1993-1994, at 590.
            Unlike the general parliamentary rules relied on by the taxpayer, Rule 53 does not "fix any time for final action" on a motion to reconsider or "provide that [such a] motion shall lapse if not acted upon at any particular time."  Opinion of the Justices, 334 Mass. at 754-755 (addressing reconsideration rule comparable to Rule 53 of Senate Rules).  And the taxpayer's argument that the motion lapsed and the underlying override vote became final ignores the prior conclusion of the justices of this court that a vote subject to a motion to reconsider is not final until there is "[a]dverse disposition" of the motion.  Opinion of the Justices, 291 Mass. at 584.  We have determined that the close of the legislative session is not the kind of "[a]dverse disposition" necessary to revive the underlying vote as the Senate's "final action."  Opinion of the Justices, 334 Mass. at 756.
            These conclusions are consistent with the Legislature's own understanding of its actions regarding section 53.  For example, the House and Senate clerks did not submit amendment sheets reflecting a veto override for section 53 to the Secretary of the Commonwealth,[21] who by statute must collect and print all acts and resolves passed during each legislative session.  See G. L. c. 9, § 4A.  And the certified copy of the enacted version of the 1993 bill, St. 1993, c. 151, reflects that the Governor vetoed section 53 and contains no certification that the veto was overridden.[22]  Accordingly, we conclude that the Senate had not finalized its "reconsider[ation]" of section 53, and despite its initial vote, it had not "approved" section 53, as required under article 2, when the 1993 legislative session ended; in other words, the 1993 bill did not amend section 17 of the act.
            b.  Taxation of Massport lessees under section 17.  The taxpayer next claims the board misconstrued section 17.
            i.  Standard of review.  In reviewing the board's decision, we review questions of statutory construction de novo.  See Shrine of Our Lady of La Salette Inc., 476 Mass. at 696.
"In doing so, [t]he general and familiar rule is that a statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated" (quotation and citation omitted).
Oracle USA, Inc. v. Commissioner of Revenue, 487 Mass. 518, 522 (2021).  In construing a statute, we begin, as we must, with the plain and ordinary meaning of the statutory language.  See Metcalf v. BSC Group, Inc., 492 Mass. 676, 681 (2023); Oracle USA, Inc., supra.  When statutory language is plain and unambiguous, it is ordinarily "conclusive as to legislative intent."  Matter of the Estate of Mason, 493 Mass. 148, 151-152 (2023), quoting Sharris v. Commonwealth, 480 Mass. 586, 594 (2018).  "Dictionaries are useful aids in determining a word's ordinary meaning" absent an express statutory definition for a term.  Garcia v. Steele, 492 Mass. 322, 328 n.6 (2023), quoting Penobscot Nation v. Frey, 3 F.4th 484, 491 (1st Cir. 2021), cert. denied sub nom. United States v. Frey, 142 S. Ct. 1668 (2022), and cert. denied, 142 S. Ct. 1669 (2022).  See Curtatone v. Barstool Sports, Inc., 487 Mass. 655, 658 (2021) ("We derive the words' usual and accepted meanings from sources presumably known to the statute's enactors, such as their use in other legal contexts and dictionary definitions" [citation omitted]).
            "[B]ecause the board is an agency charged with administering the tax law and has expertise in tax matters, we give weight to its interpretation of tax statutes" (citation omitted).  Oracle USA, Inc., 487 Mass. at 522.  Accordingly, "[i]f the board's construction of a tax law 'is reasonable, we will defer to its interpretation.'"  U.S. Auto Parts Network, Inc. v. Commissioner of Revenue, 491 Mass. 122, 128 (2022), quoting Oracle USA, Inc., supra.
            Moreover, this court will not disturb the board's "findings of fact . . . that are supported by substantial evidence."  Outfront Media LLC v. Assessors of Boston, 493 Mass. 811, 814 (2024), quoting Shrine of Our Lady of La Salette Inc., 476 Mass. at 696.
            ii.  Intersection of section 17 and section 2B.  The taxpayer contends that the board erred by declining to construe section 17 to incorporate the rules for taxation set forth in G. L. c. 59, § 2B;[23] in particular, the taxpayer asserts that section 17 "does not by its terms impose any tax independent of [s]ection 2B" and thus, where Massport land is leased for "business purposes," the taxation is governed by section 2B.
            As discussed supra, section 17 of the Massport enabling act instructs that no Massport property "shall be taxed to a lessee thereof under [G. L. c. 59, § 2B]."  G. L. c. 91 App., § 1-17.  The taxpayer's argument that section 2B should nonetheless govern taxation of lessees of Massport property is unsupportable.
            Similarly, the taxpayer's argument that section 17 does not set forth how Massport lessees are to be taxed, necessitating application of section 2B, is without support in the statute's plain language.  Section 17 provides that "lands acquired by [Massport] which were subject to taxation on the [January 1] next preceding the acquisition thereof, shall, if leased for business purposes, be taxed by the city" in which they are located (emphasis added).  G. L. c. 91 App., § 1-17.  And section 17 further specifies that such land is to be taxed "to the lessees thereof, . . . in the same manner as the lands and the buildings thereon would be taxed to such lessees if they were the owners of the fee."  Id.  Owners of land are taxed pursuant to G. L. c. 59, §§ 2, 2A.[24]  Thus, section 17 expressly sets forth that Massport lessees "shall" be taxed and provides how such lessees are to be taxed.
            c.  Meaning of "leased for business purposes" in section 17.  Related to its contention that section 2B governs taxation of Massport lessees, the taxpayer also maintains that the board erroneously determined that the property was "leased for business purposes" under section 17.  Specifically, the taxpayer contends that it did not lease the property for "business purposes" under section 17 because it also leased the property for a "public purpose" -- constructing and maintaining a cargo facility that Massport told the taxpayer was an essential governmental function when the taxpayer entered into the assignment of the ground lease -- which the taxpayer contends would render it tax exempt under section 2B.  As we have explained, however, section 17 precludes application of section 2B to Massport lessees.[25]
            Consistent with its plain meaning, the board reasonably interpreted "business purposes" under section 17 as commercial, for-profit purposes.  See Oxford English Dictionary Online II.14.a, https://www.oed.com/dictionary/business_n?tab=meaning
_and_use#11685769 [https://perma.cc/EVF8-P8WL] ("business" refers to "commercial transactions, engagements, and undertakings"); Black's law Dictionary 247 (11th ed. 2019) (defining "business" as "[a] commercial enterprise carried on for profit"); Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/business ("a usually commercial or mercantile activity engaged in as a means of livelihood"; "a commercial or sometimes an industrial enterprise"; "dealings or transactions especially of an economic nature").  See also, e.g., Boston Fish Market Corp. v. Boston, 224 Mass. 31, 33-34 & n.1 (1916) (land owned by Commonwealth was "leased for business purposes" when used by lessee's tenants to conduct commercial businesses).
            Section 17 provides that the property "shall" be taxed if the property is leased for a business purpose; contrary to the taxpayer's position, it does not preclude taxation even where the lessee's business purpose also serves a public purpose.  See Atlantic Refining Co. v. Assessors of Newton, 342 Mass. 200, 204-205 (1961) (use of public property "by occupants for their private business purposes" taxable even though that use served public purpose as well); Gloucester Ice & Cold Storage Co. v. Assessors of Gloucester, 337 Mass. 23, 27 (1958) (same).  Compare G. L. c. 91 App., § 1-17 (taxation requires only that property is "leased for business purposes"), with G. L. c. 59, § 2B (taxation requires that property is "used in connection with a business conducted for profit or leased or occupied for other than public purposes").[26]
            Applying this construction, the board concluded that the taxpayer, which is a Delaware for-profit limited liability company generally in the business of property management and is authorized to "own and operate industrial real estate" in the Commonwealth, leased the property at issue for for-profit, commercial purposes.  In doing so, the board relied on the record evidence showing that the taxpayer paid $7 million to assume the ground lease and accepted the rights and responsibilities under the lease, including ownership interests in all improvements on the property.  The taxpayer has also subleased portions of the property to various other for-profit businesses.  The board explained that, as a for-profit company, the taxpayer would "not expend such funds and place itself in a position of widespread accountability" but for "the opportunity to generate a profit."  See generally Outfront Media LLC, 493 Mass. at 822-823 (lessee's ability to "incur[] both the risks and rewards of its operations" on publicly owned land, and "enjoy[] a significant level of control over the revenues to be derived from" it, was key factor in determining whether its use is "in connection with a business conducted for profit").  In short, the board's conclusion that the taxpayer, which is in the business of real estate ownership and management, leased the property for commercial purposes, and therefore business purposes under section 17, is well supported by the record.
            4.  Conclusion.  Accordingly, we affirm the board's decision.
So ordered.
 
footnotes

 
            [1] Referring to twenty years as a "score" is presumed to derive "from the practice, in counting sheep or large herds of cattle, of counting orally from 1 to 20, and making a 'score' . . . or notch on a stick, before proceeding to count the next twenty."  Oxford English Dictionary Online, https://www.oed.com
/dictionary/score_n?tab=meaning_and_use#24002550 [https://perma
.cc/TJ9P-X75F].
            [2] Lazarus is a biblical character who is said to have been raised from the dead, according to the Gospel of John.  The Holy Bible, John 11:1-44 (King James Version).
            [3] We acknowledge the amicus brief submitted by the Massachusetts Port Authority.
            [4] We set forth the material facts from the parties' joint statement of agreed facts, which was submitted to the board, and from the board's additional factual findings, which are supported by substantial evidence.  See New England Forestry Found., Inc. v. Assessors of Hawley, 468 Mass. 138, 149 (2014).  We reserve certain facts for our discussion of the legal issues.
            [5] General Laws c. 91 App., § 1-17, provides that Massport "shall not be required to pay any taxes . . . upon . . . any property acquired or used" by Massport.
            [6] On the same day as the assignment, Massport and the taxpayer amended the ground lease, extending certain deadlines for the completion of the cargo facility and agreeing to other changes not relevant to the issues on appeal.
            [7] The city did not tax the property in the years between Massport's 1990 acquisition of the property and the 2017 levy.
            [8] The taxpayer appealed from each denial of abatement to the board; the taxpayer also challenged the assessors' valuation of the property for the years 2017-2019, which prevented the board from issuing a final decision as to those years.  Accordingly, this appeal concerns only the tax assessed in 2020.
            [9] During its consideration of the parties' cross motions for summary judgment, the board identified a discrepancy between two published versions of the act, one of which incorporated section 53 of the 1993 bill.  Although neither party referenced section 53, the board invited the parties to address whether section 17, which as discussed infra is the provision governing taxation of Massport property, had been amended in 1993.
            [10] This provision originally referred to G. L. c. 59, § 3A, a statute that was repealed and replaced by G. L. c. 59, § 2B.  See St. 1978, c. 580, § 16 (repealing § 3A); St. 1979, c. 797, § 11 (inserting § 2B).  Accordingly, we refer to G. L. c. 59, § 2B.
            [11] Section 17 also permits taxation of lessees of Massport property comprising certain portions of the "Commonwealth Flats" in South Boston if leased for "business purposes."  G. L. c. 91 App., § 1-17.  This provision codified the taxing arrangement that preexisted Massport's creation, whereby the city was permitted to tax the State-owned Commonwealth Flats in South Boston whenever those lands were leased for business purposes.  See 1956 House Doc. No. 2575, at 34-35.
            [12] The legislative history is taken from entries in the Senate and House Journals, which were provided to the board and which we generally accept as accurate.  See Powers v. Secretary of Admin., 412 Mass. 119, 125 n.7 (1992) (absent record-based reasons to question its accuracy, we are "unwilling to enter into an examination of the internal record-keeping process of either branch of the Legislature," as "[t]he rules of both the House and the Senate contain numerous procedural mechanisms to ensure that recorded voice votes [in Senate and House Journals] accurately reflect the sense of the members").
            [13] The bill originated in the House of Representatives as House Bill No. 5280; at that time, it did not include the language comprising section 53.  See House Bill No. 5280 (June 30, 1993).  After it passed the House, amended and as House Bill No. 5318, the Senate further amended the bill.  See House Bill No. 5318 (July 15, 1993); Senate Bill No. 1705 (July 26, 1993).  A conference committee appointed to facilitate agreement between the chambers further amended the bill and added section 53.  See House Bill No. 5379, § 53 (Aug. 9, 1993); Manual for the General Court, 1993-1994, at 675-677 (governing conference committees).  The conference committee version, denominated House Bill No. 5379, then passed both chambers and was sent to the Governor.
            [14] Section 53 would have maintained Massport's tax exemption, but it would have eliminated the provision regarding the treatment of the Commonwealth Flats.  See note 11 supra.  In addition, land that was not previously taxable under section 17 -- because, for example, it was tax exempt when Massport was created and was acquired from Massport's predecessor entities, including the State Airport Management Board -- would have become taxable depending on the purpose for which the land was used or leased.  See House Bill No. 5379, § 53 (Aug. 9, 1993).
            [15] Payments in lieu of taxes (PILOT) are payments by a tax-exempt entity intended to offset the host municipality's lost revenue as a result of the entity's tax exemption.  Office of the State Auditor, A Review of the Financial Impact of the c. 58 Payments-in-Lieu-of-Taxes (PILOT) Program on Mass. Cities and Towns 1 (Oct. 1994).  PILOTs have been made on land owned by the Commonwealth since 1910.  Id. at 2.  Section 17 requires Massport to enter PILOT agreements with Boston, Chelsea, and Winthrop.  G. L. c. 91 App., § 1-17.  In the tax year at issue, 2020, Massport made $21 million in payments in lieu of taxes.  See Massport Annual Comprehensive Financial Report, at 43 (2021).
            [16] Rule 53 of the Rules of the Senate provides:
"No motion to reconsider a vote shall be entertained unless it is made on the same day on which the vote has passed, or on the next day thereafter on which a quorum is present and before the Orders of the Day for that day have been taken up.  If reconsideration is moved on the same day, the motion shall (except during the last week of the session) be placed first in the Orders of the Day for the succeeding day . . . ."
Manual for the General Court, 1993-1994, at 584-585.
            [17] The relevant portion of article 2 provides:
"No bill or resolve of the senate or house of representatives shall become a law, and have force as such, until it shall have been laid before the governor for his revisal; and if he, upon such revision, approve thereof, he shall signify his approbation by signing the same.  But if he have any objection to the passing of such bill or resolve, he shall return the same, together with his objections thereto, in writing, to the senate or house of representatives, in whichsoever the same shall have originated; who shall enter the objections sent down by the governor, at large, on their records, and proceed to reconsider the said bill or resolve.  But if after such reconsideration, two thirds of the said senate or house of representatives, shall, notwithstanding the said objections, agree to pass the same, it shall, together with the objections, be sent to the other branch of the legislature, where it shall also be reconsidered, and if approved by two thirds of the members present, shall have the force of a law:  but in all such cases, the votes of both houses shall be determined by yeas and nays; and the names of the persons voting for, or against, the said bill or resolve, shall be entered upon the public records of the commonwealth" (emphases added).
Part II, c. 1, § 1, art. 2.
            [18] To be sure, as the taxpayer observes, our decision in Kay Jewelry Co. arose in the context of an override vote that initially failed to garner a two-thirds majority but was subsequently passed by the requisite majority on reconsideration.  See Kay Jewelry Co., 305 Mass. at 583-584.  By contrast, here, the Senate's initial vote to override the Governor's veto of section 53 succeeded.  But our conclusion in Kay Jewelry Co. -- that it is consistent with article 2 for the Legislature to set procedural rules for determining whether to override a veto -- was not, as the taxpayer contends, limited to failed override votes.  Tellingly, in Kay Jewelry Co., we relied on precedent involving reconsideration of initial votes approving (as opposed to rejecting) a measure.  See id. at 585-586, citing Adams v. Cook, 245 Mass. 543, 547-549 (1923) (reconsideration of vote initially approved by two-thirds majority), and Mansfield v. O'Brien, 271 Mass. 515, 517-519 (1930) (vote of joint convention of Springfield board of aldermen and common council electing assessor could be reconsidered and result in different candidate being elected assessor).
            [19] The taxpayer argues that the senator who moved to reconsider, as one who voted against section 53 during the initial override vote, was without authority to do so because, under Robert's Rules of Order, a motion to reconsider "can be made only by a member who voted with the prevailing side."  Robert's Rules of Order Newly Revised § 36, at 309 (9th ed. 1990).  Rule 53 of the Rules of the Senate, however, does not incorporate a prevailing-side limitation.  As the Notes of Rulings on Rule 53 explain:  "[t]he right to move a reconsideration is not limited to those who voted with the majority on the motion which is to be reconsidered."  Manual for the General Court, 1993-1994, at 746.  As such, the general parliamentary rule does not apply.  See Rule 62 of the Rules of the Senate, in Manual for the General Court, 1993-1994, at 590 (parliamentary rules only apply when not inconsistent with Rules of Senate).  The lack of any challenge to the motion bolsters our conclusion that the motion to reconsider, albeit made by a member of the nonprevailing side, comported with the Senate's procedures.  See Opinion of the Justices, 334 Mass. at 754–755.
            [20] Robert's Rules of Order provide: 
"[i]f the motion to [r]econsider is not called up within these [certain] limits of time, the situation becomes the same as if there had been no such motion, and the vote which it was proposed to reconsider . . . comes into full force[] as if in effect, so far as applicable, from the time the vote was originally taken."
Robert's Rules of Order Newly Revised § 36, at 315-316.  Similarly, Mason's Manual states that, if "the motion to reconsider is made and not considered, the effect terminates with the session."  Mason's Manual of Legislative Procedure § 467, at 307 (1989).
            [21] Tellingly, when the Legislature overrode the Governor's vetoes of sections 54 and 138 of the 1993 bill, the House and Senate clerks prepared, signed, and transmitted amendment sheets -- which are included in the legislative package for St. 1993, c. 151, on file at the Massachusetts Archives -- reflecting those overrides.  The House amendment sheet for section 138 is instructive because it reflects that a representative moved to reconsider the veto override vote, but that the motion was "negatived," and the section was then transmitted to the Senate.
            [22] By contrast, St. 1993, c. 151, contains certifications by the House and Senate clerks that sections 54 and 138 were passed over the Governor's veto.  St. 1993, c. 151, at 63-64.  Both certifications are signed by the Secretary of the Commonwealth and declare sections 54 and 138 to "thereby ha[ve] the force of law."  Id.
            [23] Section 2B is a general taxation statute governing taxation of lessees of the Commonwealth's real property and provides, inter alia, that
"real estate owned in fee or otherwise [by] . . . the commonwealth, . . . if used in connection with a business conducted for profit or leased or occupied for other than public purposes, shall for the privilege of such use, lease or occupancy, be . . . taxed annually as of January first to the user, lessee or occupant in the same manner and to the same extent as if such user, lessee or occupant were the owner thereof in fee . . . .  This section shall not apply to a use, lease or occupancy which is reasonably necessary to the public purpose of a public airport . . . ."
G. L. c. 59, § 2B.
            [24] General Laws c. 59, § 2, provides, "[a]ll property, real and personal, situated within the commonwealth, . . . unless expressly exempt, shall be subject to taxation."  And § 2A (a) provides, "[r]eal property for the purpose of taxation shall include all land within the commonwealth and all buildings and other things thereon or affixed thereto."  G. L. c. 59, § 2A.
            [25] The board reasonably concluded that, in the face of section 17's direct prohibition against application of section 2B, applying section 2B would be inconsistent with the act.  See G. L. c. 91 App., § 1-29 ("All other general or special laws, or parts thereof, inconsistent herewith are hereby declared to be inapplicable to the provisions of this act . . .").
            [26] See Ciani v. MacGrath, 481 Mass. 174, 180 (2019) (Legislature's use of "different words strongly suggests that it intended to convey a different meaning"); Commonwealth v. Williamson, 462 Mass. 676, 682 (2012) ("use of different language strongly suggests the legislative intent to convey a different meaning").